FRANK LEE, Appellant, v. W. E. FUETTERER BATTERY & SUPPLIES COMPANY, WILLIAM E. FUETTERER, ESTELLE GREENE and HENRY H. SPENCER.—23 S. W. (2d) 45.

Division One, October 14, 1929.

*John P. Leahy, John V. Lee* and *William O. Gatewood* for appellant.

*Anderson, Gilbert & Wolfort* for respondents.

1208

SEDDON, C.—Action for libel, instituted by plaintiff, a lawyer, against the W. E. Fuetterer Battery & Supplies Company, a Missouri corporation, and three individuals, William E. Fuetterer, Estelle Green and Henry H. Spencer, as defendants, wherein plaintiff seeks the recovery of $100,000 as compensatory damages and $50,000 as punitive damages. The defendant, Estelle Greene, was employed as a bookkeeper by the corporate defendant during the years 1923 and 1924, and the defendant, Henry H. Spencer, is a lawyer who, at times, appears to have represented the corporate defendant. A trial of the action to a jury resulted in the return of a unanimous verdict in favor of all of the defendants. After unsuccessful motions for a new trial and in arrest of judgment, plaintiff was allowed an appeal to this court from the adverse judgment entered upon the verdict.

The petition charges, in substance, that the several defendants maliciously, unlawfully, willfully, wrongfully and wantonly combined and confederated together with the purpose and intent of injuring the plaintiff in his good name and fame, and in the practice of his profession, by making false, unfounded, untrue and malicious statements in writing, of and concerning the plaintiff, by writing, or causing to be written, on or about February 12, 1924, a certain letter addressed, directed, mailed and delivered to the Grievance Committee of the St. Louis Bar Association, in which letter the defendants stated of and concerning plaintiff the following false, unfounded, untrue and libelous matter, to-wit: ''I have been double-crossed by a lawyer in St. Louis. . . . Mr. Frank Lee of that firm called to see me, professing the closest friendship. He said he would not handle the said company's case if I was going to· contest it. He said that he was my attorney and would look out for my interests. . . . Relying upon him, I disclosed my whole hand to him, including my claim for damages on account of breach of contract. . . . Mr. Lee has disregarded his relationship with me as my attorney. . . . I claim that Mr. Lee has deliberately switched from my side of the case to the other, after assuring me that he would remain my attorney, and that he used the confidential information which I gave him to make my case much harder; . . . that he was my attorney and would not do anything unfriendly to my

interests; . . . that it was after this assurance on his part that I disclosed my secrets to him."

The several defendants answered jointly, denying generally the allegations of the petition. During the progress of the trial, the corporate defendant, and the individual defendant William E. Fuetterer, were permitted to file an amended answer, over the objection and exception of plaintiff. The amended answer of the two defendants aforesaid avers that these defendants, on or about February 12, 1924, wrote and caused to be written, addressed, directed and delivered to the Grievance Committee of the St. Louis Bar Association a certain letter, which is set out verbatim in the amended answer, and which letter will appear hereafter in this opinion. The amended answer further avers that the statements in said letter are each and every one true, and "that the Mr. Lee who called upon these defendants stated that his name was Frank Lee; that the Mr. Lee who called on said defendant, W. E. Fuetterer Battery & Supplies Company, was the only Mr. Lee to whom defendant, W. E. Fuetterer, gave the confidential information about the claim against the Cincinnati Storage Battery Company; that thereafter defendant William E. Fuetterer was called before said Grievance Committee of said Bar Association and there were present two Messrs. Lee; that said defendant pointed out the Lee who he claimed had been out to his place of business, and was informed it was John V. Lee, not Frank Lee; that the communication to the Grievance Committee of said Bar Association by these defendants was written in their private, public, social, civil and moral duties and interests, for the purposes set out in said letter, and is a privileged communication."

The reply to said amended answer is a general denial.

The uncontroverted evidence herein is that the defendant, William E. Fuetterer, caused to be written and mailed a certain letter, dated February 12, 1924, addressed and directed to "Grievance Committee, St. Louis Bar Association, care of Mr. George C. Hitchcock, Federal Reserve Bank Building, St. Louis," which letter reads as follows:

"I have been double-crossed by a lawyer in St. Louis and I want to state the facts to you to see if you can do anything for me.

"For many years the firm of W. O. Gatewood & Associates, International Life Building, have been handling legal business for me, and I have become rather well acquainted with Mr. Lee of that firm and have considered him my personal attorney in commercial matters.

"Last fall I had a dispute with the Cincinnati Storage Battery Company of Cincinnati, Ohio, whom I have represented in St. Louis and vicinity as sales agent for some years. This dispute involved the Cincinnati company selling to other dealers in my territory, contrary to their written contract with me, and causing me

a damage in the neighborhood of $8,000; at the time I owed the Cincinnati Storage Battery Company $1,223.97 on account, which, of course, I refused to pay them until they gave me satisfaction on the other matter.

"The Cincinnati company put this account in regular collection channels and it came, thereby, into the hands of Gatewood & Lee. Mr. Lee of that firm called to see me, professing the closest friendship. He said that he would not handle the said company's case if I was going to contest it. He said that he was my attorney and would look out for my interests.

"Relying upon him, I disclosed my whole hand to him, including my claim for damages on account of breach of contract. My desire, of course, was to get the Cincinnati Storage Battery Company to sue me on this account in St. Louis, so that I could have them in court to answer my claim against them, otherwise it would be necessary for me to go to Cincinnati, file suit there, take my witnesses there and be under additional large items of expense which it is unnecessary to enumerate.

"Mr. Lee has disregarded his relationship with me as my attorney and has filed suit against me on this account, but not in the name of the Cincinnati Storage Battery Company. Instead, he alleges an assignment of the account to a certain Vourdon Fricke, of whom I have never heard.

"My lawyer informs me that, although I may use my claim for damages as a defense against this unknown Fricke's suit, still it is impossible to recover the large balance over and above the $1,223.95 which I claim, and that the Cincinnati Storage Battery Company is not in court at all, and that I may be precluded from suing that company if I use my claim for damages as a defense in this suit.

"I claim that Mr. Lee has deliberately switched from my side of the case to the other after assuring me that he would remain my attorney, and that he used the confidential information which I gave him to make my case much harder through this pretended assignment.

"I have been advised by attorneys that it is useless to make this complaint, since I will never hear anything more of it, but I don't believe you will treat me in this manner and I believe that you will allow me a chance for a hearing and the chance to confront this man.

"I have several witnesses to my conversation with him, and to his assurance that he was my attorney and would not do anything unfriendly to my interests, who knows that it was after this assurance on his part that I disclosed my secrets to him.

"Yours very truly,
"W. E .FUETTERER,
"WEF :B.
"President."

"P. S.—About three years ago the Wagoner Tire Co. turned over a claim to Gatewood for collection and Mr. Lee came to me and I told him my side of the story, and he told us he could not represent the Wagoner Company, as he was my attorney. He turned the case of the Wagoner Tire Co. down."

The letter was written upon the stationery of W. E. Fuetterer Battery & Supplies Company.

The membership of the St. Louis Bar Association is composed of a considerable number of lawyers who practice their profession in the city of St. Louis. The said Bar Association functions and carries on its purposes and objectives by and through a number of committees, among which is a Committee on Grievances, commonly referred to as the Grievance Committee. The Grievance Committee consists of six individual members of the St. Louis Bar Association, and employs a secretary and attorney. At the time the foregoing letter was written and delivered, Mr. Clarence F. Wescoat, a lawyer and a member of the St. Louis Bar Association, was the secretary and attorney for the Grievance Committee of the St. Louis Bar Association.

The powers, duties and authority of the Grievance Committee are prescribed and set forth in article nine of the constitution and by-laws of the St. Louis Bar Association, as follows:

"Whenever any complaint shall be preferred against a member of the Association for misconduct in his relation to this Association, or in his profession, the person or persons preferring such complaint shall present it to the Committee on Grievances, in writing, and subscribed by him, or them, plainly stating the matter complained of, with particulars of time, place and circumstances.

"The Committee shall thereupon examine the complaint, and, if they are of the opinion that the matters therein alleged are of sufficient importance, shall cause a copy of the complaint, together with a notice of not less than five days, of the time and place when the Committee will meet for consideration thereof, to be served on the member complained of, either personally, or by leaving the same at his place of business during office hours, properly addressed to him. At the time and place appointed, or at such other time or place as may be designated by the Committee, the member complained of may file a written answer or defense.

"The Committee shall thereupon proceed to hear and determine the matter of the complaint, and, if it finds under the evidence that the complaint is true, it may adjudge that such member be suspended or expelled from the Association, and the Committee may also report to the Executive Committee, in writing, that, in its judgment, the case is such as to require prosecution in the courts. At least four members of the Committee must be present at the hearing

of any such complaint, and concur in the adjudication or recommendation, and such decision shall be final unless appealed from, as hereinafter provided.

"The complainant and the member complained of shall be allowed to appear in person and by counsel, who must be members of the Association. The witnesses shall vouch for the truth of their statements on their word of honor. The Committee shall have the power to summon witnesses, and, if members of the Association, may neglect or refuse to appear it may be treated as misconduct.

"Any member so suspended or expelled from the Association may appeal from the decision of the Committee to the Executive Committee within twenty days from the date of service of notice of such acts of the Committee; provided, on any such appeal, such members shall file with the Executive Committee a copy of the complaint against him, together with a transcript of the evidence presented before the Grievance Committee. The Executive Committee shall proceed to review the complaint and also things before, and adjudication or recommendation of, the Committee on Grievances, and may affirm, modify or reverse any such adjudication or recommendation. The action thus taken by the Executive Committee shall be final.

"The final action adjudging the expulsion of any member, or recommending prosecution in the courts, shall be reported to the Association at the next meeting thereof and entered upon its records.

"Whenever specific charges of fraud or gross unprofessional conduct shall be preferred against a member of the Bar not a member of the Association, or against a person pretending to be an attorney or counselor at law, practicing in the city of St. Louis, or whenever any complaint shall be preferred concerning any other person touching the administration of justice, the Committee on Grievances shall investigate the same, and, with the approval of the Executive Committee, shall take such action thereon as may be proper in the premises."

The antecedent facts and circumstances leading up to the writing and delivery of the aforesaid letter are thus disclosed by the evidence: Plaintiff was born and educated in the city of St. Louis, and was admitted to the bar in June, 1922, at the age of twenty-seven or twenty-eight years. He was employed by a firm of lawyers engaged in the practice of law under the firm name of W. O. Gatewood & Associates. The firm appears to have been composed of W. O. Gatewood and John V. Lee, the latter of whom is a brother of plaintiff. The firm had previously engaged in the practice of law under the name of Gatewood & Lee, and seemingly specialized in the collection of commercial accounts for various clients, and employed several lawyers or clerks, including plaintiff and another brother of plaintiff, Bernard Lee, and also one Vourdon Fricke.

The evidence on behalf of defendants is to the effect that, during the years 1920 to 1924, the Fuetterer Battery & Supplies Company and William E. Fuetterer "had dealings with Gatewood & Associates." During such period, the corporate defendant entrusted to the firm of Gatewood & Associates some six or seven commercial accounts, of small amounts, for collection. Some of those accounts were collected by Gatewood & Associates without suit, but in a few instances suits were instituted by Gatewood & Associates, as attorneys for the corporate defendant, to enforce the collection of certain of the accounts. It appears from the evidence that, in the latter months of 1923, or the early part of 1924, the Cincinnati Storage Battery Company of Cincinnati, Ohio, sent to Gatewood & Associates, for collection, an account owing by, and due from, the Fuetterer Battery & Supplies Company. There is a sharp conflict in the evidence as to the exact time and date when Gatewood & Associates presented such account to the Fuetterer Battery & Supplies Company for payment, and by what particular individual representative of Gatewood & Associates the account was presented to the Fuetterer Company for payment. Plaintiff, Frank Lee, testified that he had charge of claims or accounts that were sent to the firm of Gatewood & Associates by "out-of-town clients," and that he, himself, "handled the claim" of Cincinnati Storage Battery Company against the Fuetterer Company, and personally presented the account to the defendant, William E. Fuetterer, for payment in the latter part of November, 1923. Plaintiff testified further that he was well and personally acquainted with the defendant Fuetterer; had known Fuetterer for two or three years, and had met him frequently prior to receiving the account of the Cincinnati Storage Battery Company, having previously attended to several small collections for the Fuetterer Company; and that defendant Fuetterer well knew plaintiff as Frank Lee, and usually addressed plaintiff by his Christian name, Frank. As respecting the interview between plaintiff and defendant Fuetterer, in the matter of the account or claim of the Cincinnati Storage Battery Company against the corporate defendant, plaintiff testified as follows:

"I received the claim on November 26, 1923, and immediately telephoned Mr. Fuetterer and told him that I had it for adjustment; that I would like to have him come down to see me about it. He told me he was pretty busy to come down that day, and I suggested the next day, and he said he couldn't make it then, either. He said he wanted to show me a lot of papers in connection with it, and wanted to know if I could come out to see him. I told him I could not possibly make it that day, or the following day, and then, at his request, I called at his office on Wednesday, the second day following, Thanksgiving eve, November, 1923. We made an appoint-

ment for the Wednesday following, at three o'clock, at his office, the business of which he was president, 2123 Locust Street. When I came to his office at three o'clock on the afternoon of our appointment, he was sitting in the rear of the room, and, before I saw him, he hollered, 'Hello, Frank; come on back.' I walked back to his desk. When I got back, he said, 'I will be with you in just a minute.' I sat down and he dismissed the girl (stenographer), and the girl went over to her typewriter desk. He said, 'You came to see me about that Cincinnati matter?' I said, 'Yes.' He said, 'I turned all those papers over to my attorney, Mr. Spencer. Do you know him?' I said, 'No. I may know him by sight, but I don't know him by name.' . . . With that I took my hat and began to leave. We both walked towards the door, outside the railing, and, as we walked from the desk to the door, the conversation continued. He told me that the Cincinnati Storage Battery Company owed him more money than he owed them. I said, 'Is that so?' He said, 'Yes; but understand, I want you to bring this suit, Frank.' He said, 'They are no good, and be sure to get your fee, be sure about that.' I said, 'I will take care of that.' . . . I told him I would communicate with the Cincinnati Storage Battery Company and have them send me their file of correspondence before determining whether or not I would bring suit. He said, 'Get me right; understand, I want you to bring suit, but remember about your fee;' and with that we were to the door of his office, and I left. The whole time I was in his office the conversation I have related consumed less than five minutes time, and during that time not a single document or paper was exhibited to me, nor was there any additional merits or demerits of any case discussed. . . . Q. Did you communicate with the Cincinnati Storage Battery Company? A. I did, the following Friday, Thursday being Thanksgiving, and, when I got to the office Friday, I wrote my letter. Q. And received the information you required from them? A. Yes, sir, Q. When you got that information from the Cincinnati Storage Battery Company, what did you do with the papers? A. Well, I turned them over to John V. Lee, my brother, by placing them, or having them placed, on his desk. . . . Q. After the filing of that suit against Mr. Fuetterer, on the part of the Cincinnati Storage Battery Company, was there an assignment of the claim made by the Cincinnati Storage Battery Company? A. Yes, sir. Q. To whom was that made? A. Vourdon Fricke. Q. That suit was brought in the name of Vourdon Fricke, as assignee? A. Yes, sir. Q. Now, after the filing of that suit, you stated you had a conversation with Mr. Fuetterer over the telephone? A. Yes, sir. . . . Q. State what he said over the telephone. A. That was about January 17, 1924. The suit was filed on January 15, 1924, and that was two or three

days after the suit had been filed. Mr. Fuetterer called me up and said, 'Hello, Frank.' I said, 'Yes.' He said, 'I see where you sued me on that Cincinnati claim.' I said, 'Yes, you told me.' He said, 'You didn't say that you were going to assign the account.' I said, 'You told me they were no good and to protect my fee, and I did it.' With that the conversation ended abruptly. . . . Q. What became of the Cincinnati Storage Battery Company suit? A. Judgment was rendered against the Fuetterer Battery & Supplies Company for the full amount of the debt and interest and costs. . . . Q. Did you have any other conversation with the defendant here, after the filing of that suit? A. Yes. After Mr. Fuetterer 'phoned me, Mr. Spencer 'phoned with the same inquiry, and I had repeated to him what I told Mr. Fuetterer, and the conclusion was, in his case, 'We will get you.' In relating the conversation with Mr. Fuetterer being abruptly closed, that was Mr. Fuetterer's closing remark, 'We will get you for this;' and, when Mr. Spencer telephoned the following day, it was precisely the same conclusion. Q. He said he would get you? A. Yes, sir. Q. Did you receive a letter from the Committee on Grievances of the Bar Association of the city of St. Louis, and in that letter you were notified that Mr. William E. Fuetterer had filed a complaint against you with the Grievance Committee of the Bar Association, and notifying you to appear before the Grievance Committee of the Bar Association on Friday, March 7, at three o'clock? A. Yes, sir. Q. Did you so appear before that committee? A. I did, accompanied by my brother, John V. Lee, as my attorney. . . . Q. What took place when you went in there? A. When we went in there, Mr. Wescoat announced that the matter of business was the complaint of Mr. Fuetterer against Frank Lee—we were all sitting around—that they were now ready to proceed with the hearing of the case, having agreed to have the case reported and transcribed, and, upon that being done, Mr. Fuetterer stepped up and said, or, rather, when Mr. Wescoat said the charges were against Frank Lee, Mr. Wescoat pointed to me and identified me as Frank Lee. Mr. Fuetterer replied, 'That is the man who came up to see me;' pointing to John V. Lee. It was suggested by Mr. Wescoat that an amendment to the complaint should be made, and that was done orally, and the meeting was then continued at the request of Mr. Fuetterer. Q. You say the complaint was changed—in what respect—what was done? A. Orally changed so as to substitute 'John V. Lee' in the place of 'Frank Lee.' Q. What became of the charge against you? A. Excepting so far as I have stated to you now, I don't know. I never received any notification that it was dismissed or dropped, other than what was suggested in the room at that time, which I have just related. Q. At that time, Mr. Lee, when this complaint was changed,

did Mr. Fuetterer say anything to you about having regretted bringing you into the case? A. No, sir. We had no conversation at all at that time or since then; nothing at all.''

Cross-examination: ''Q. And, of course, being an attorney, you know there is a statute in Missouri that gives an attorney a lien on the amount collected for his fee, don't you? A. Yes, sir. Q. So that there never was any danger of you losing your fee, if you collected this claim against Fuetterer; you had a lien for that? A. If the money was paid to us, there would be; but if the money was paid direct to the company in Cincinnati, that would be a different proposition. . . . Q. But you are a Missouri attorney, with a Missouri lien? A. Yes, sir; but in this case the other party was out of the State, and Mr. Fuetterer told me the other party was no good. Q. Was Mr. Fuetterer any good? A. I presume so. Q. You expected to make that collection and enforce the attorney's lien against Mr. Fuetterer? A. In the event of success. Q. So that it was not necessary at all to make an assignment of this claim to Vourdon Fricke to protect any fee you had in the matter? A. I don't know. Q. Why do you say, then, or why did you say you told Mr. Fuetterer the reason you assigned it to Mr. Vourdon Fricke was to protect your fee, if you didn't know? A. I said that was done. I didn't know that it was necessary. That was a precaution which assured it. Q. The fact that Fuetterer had a counterclaim had nothing to do with this assignment? A. I knew of no counterclaim. Q. Didn't you testify that Mr. Fuetterer told you he had a claim against them and wanted them to sue him? A. No, sir; he said nothing of the counterclaim, and I so testified. Q. Didn't you testify in direct examination that Mr. Fuetterer told you they owed him more money than he owed them? A. That was my precise testimony. Q. Then you did know that Mr. Fuetterer had a claim against them in any action on their claim against him? A. To the extent that statement implied. Q. Didn't you know, if that claim of the Cincinnati Storage Battery Company was assigned to Vourdon Fricke, that Mr. Fuetterer would not be allowed to prove up all the claim against Vourdon Fricke? A. No, sir. Q. You didn't know that? A. No, sir; I didn't know it. Q. You testified in your direct examination that Vourdon Fricke, as assignee, got a judgment against Fuetterer for the full amount? A. Yes, sir. Q. And you testified that Mr. Gilbert represented Mr. Fuetterer? A. That is right. Q. Now, state to the jury whether or not Mr. Gilbert, at that time, tried to prove up this counterclaim in that case of Vourdon Fricke v. W. E. Fuetterer Battery & Supplies Company? A. He tried to. Q. And didn't the court prevent Mr. Gilbert from trying to maintain the claim of Mr. Fuetterer against Vourdon Fricke on the ground that Fuetterer had no right to make that claim against the assignee? A.

Yes, sir. Q. So that, when that case was tried, Mr. Fuetterer was barred by the court's order from making any claim he claimed to have against the Cincinnati Storage Battery Company, as against Vourdon Fricke? A. Yes, sir. Q. Who is Vourdon Fricke? A. An employee of Mr. Gatewood. Q. Employed by the same man you are? A. Yes, sir. Q. Employed by the same man your brother, John V. Lee, is? A. Yes, sir. Q. Do you know what Vourdon Fricke paid the Cincinnati Storage Battery Company for its claim against Fuetterer? A. Seventy-five per cent. Q. Cash or what? A. In the form of a note. Q. When was this note due and payable? A. On demand. Q. Has he ever paid that note? A. Not yet. Q. He has never paid that? A. No, sir, Q. So that the Cincinnati Storage Battery Company assigned this claim to Vourdon Fricke, a co-employee of yours and John Lee, for a note payable on demand, which has never been collected? A. That is right. Q. Or paid? A. That is right . . . Q. Do you recall very distinctly that you called at Fuetterer's office on November 28, 1923, your memory was good on that point? A. Yes, sir. Q. Tell us how long it was after that date that the assignment was made to Vourdon Fricke? A. Precisely, I don't know. Q. You can't recall that? A. No. Q. That was rather important, under the circumstances of that suit? A. I didn't think it was. Q. Don't you think it was important that Fuetterer, in that suit, was not allowed to put in his counterclaim against Vourdon Fricke; didn't you think it would be quite important? A. It developed so. Q. You had no idea it would develop so when that assignment was made? A. No, sir. Q. Now, you told the jury the only reason it was assigned to Vourdon Fricke was to protect your fee? A. That was the sole and only reason. Q. Why did Fricke give a note, then, payable on demand? A. For the consideration of that account. Q. Who else signed that note? A. Nobody. Q. How long has he (Fricke) worked for you and John Lee and Gatewood? A. About ten years or better. Q. Does he work on a salary? A. Yes, sir. Q. Does he also get part of the profits? A. No, sir. Q. He is on a profit-sharing basis there? A. No, sir. . . . Q. Now, Mr. Lee, you say you just handled a few small collections for Fuetterer? A. Yes, sir. Q. The fact is, his business didn't amount to much? A. No, it didn't. Q. In fact, you were perfectly willing, when a $1200 claim came along against him, to throw his business out of the window and take this claim against him? A. No, I didn't do that. I went to him and told him I was representing a client adverse to him, and I told him the circumstances, and he begged me to bring suit and to protect my fee; that is what I did. . . . Q. Mr. Lee, as I understand you to say, after the suit was filed by Vourdon Fricke against Fuetterer Battery & Supplies Company, claims had

been in the office—claims came into the office—claims that Mr. Fuetterer had sent you? A. Yes, sir. We continued to handle the claims awhile in our files until he told us not to. Q. Then the firm continued to handle these claims until you received this letter from Mr. Fuetterer? A. Instructing us not to do so. Q. Then you ceased? A. Yes, sir. Q. After you received that letter (dated February 26, 1924), your firm ceased to have any more dealings with Mr. Fuetterer? A. Yes, sir.''

The defendant William E. Fuetterer testified on direct examination that he had some transactions with the firm of Gatewood & Associates concerning small collections, some of which were handled without suit, and others by suit; that most of his transactions with the firm were had through the mail and by correspondence; that he had called once at the office of Gatewood & Associates, respecting a suit brought for the Fuetterer Company against a partnership in St. Louis, at which time he talked with John V. Lee, whom defendant knew, at that time, only as Mr. Lee; that John V. Lee represented defendant in the trial of that suit; that John V. Lee called at defendant's office in the year 1922, respecting a claim due from the Fuetterer Company to the Wagoner Tire Company, and that John V. Lee told defendant if the claim were paid, he would make a fee for collecting the claim, but if the claim were not paid, he (Lee) would return the claim to the Wagoner Tire Company; and that defendant refused to pay the claim, and John V. Lee returned the claim to the Wagoner Tire Company. Defendant Fuetterer denied that plaintiff, Frank Lee, had called at his office at any time. He also testified that John V. Lee came to defendant's office in December, 1923, or the first week in January, 1924. Defendant Fuetterer thus testified respecting such interview:

''He (John V. Lee) said, 'Do you remember me?' I said, 'Your face is familiar.' He said, 'I am Mr. Lee.' I said, 'Oh, yes; come in.' He sat down and said, 'I have a claim against you of the Cincinnati Storage Battery Company, amounting to twelve hundred some odd dollars.' He said, 'I am handling your claims, I want to be fair with you. If I can collect this, there is fifteen per cent. If I go to court, I am your attorney and I can't handle it.' I said, 'All right, Mr. Lee, I will tell you about it.' I showed him what I had done, putting men out on the road, and had gotten out a catalogue, and went all through the matter. After we got through I walked to the door with him. He said, 'That is all right, Fuetterer, I will turn the claim back.' Q. You say you talked to him about this counterclaim? A. Yes, sir; I showed him the advertising I had put out, and I told him I had put five men on the road, and done billboard and newspaper advertising, and was trying to build up a wholesale business on batteries. Q. What did that have to do with

the counterclaim? A. I had a contract with the Cincinnati Storage Battery Company, and about July, 1923, the president of the concern, and a personal friend of mine, sold out his interest in the business to a man named Bullock and a man named Brenner, in St. Louis, and Brenner went up to Cincinnati to run the Cincinnati Storage Battery Company, and they began to sell in my territory. Q. Did you tell this to Mr. Lee at this time? A. Yes, sir. I told Mr. Lee I had this contract—that Mr. Brenner knew that I was building up a little business on the Cincinnati batteries, and he began to shave into my territory, and selling them at the same prices they were selling them to me. They had me in a nine hole. I couldn't go out and get another battery, after I had tried to build up the proposition. The customers began asking for the Cincinnati batteries, and they were selling them here. I told him (Lee) I would not pay them, and I wanted them to come to St. Louis and sue, because, if I had to go down to Cincinnati to sue them, I would have to take my five salesmen, the advertising agency, the newspaper men and the man who put up the billboard advertising, and, if they got a couple of continuances, the railroad fare and hotel bills would break me up, and I had to wait until they sued me in St. Louis. Q. Did you ever tell him (Lee) you wanted him to sue you? A. No, sir. Q. Now, have you related all the conversation you had on that occasion? A. I told him also that I had a counterclaim, I figured between eight and nine thousand dollars, and we walked to the door, and he assured me that he was going to send the claim back to the Cincinnati people. He couldn't handle the case. About four or five days afterwards, Mr. Lee called up and asked me if I would give him copies of the invoices that we owed the Cincinnati Storage Battery Company. I told him I couldn't give them right off hand, but I would have the girl make them up. I instructed the girl to get out the files and make copies and send them down to him. I got ready to mail them down to him, but we hadn't mailed them to him—I got a document served on me from the court. I glanced over it and put it in the drawer, and figured that the Cincinnati Storage Battery Company had sued me, which I wanted done, and forgot about it until Mr. Spencer happened to drive by the place about a week later. I gave Mr. Spencer the piece of paper, and he read it over. He said, 'You haven't been sued by the Cincinnati Storage Battery Company; you have been sued by someone the claim was turned over to.' I said, 'What does that mean?' He said, 'You are just out of luck on your counterclaim. You just have to pay it, and you are hooked.' Then he told me it had been assigned, and I called up Gatewood & Lee's office and asked for Mr. Lee, and I got him on the 'phone—Q. Which Mr. Lee? A. I don't know. I said, 'Mr. Lee,' and they put Mr. Lee on the 'phone, and I said,

'Mr. Lee, you have double-crossed me.' He said, 'I never done anything of the sort.' I said, 'You certainly have.' He said, 'I will punch you in the nose.' I said, 'Come on out, you know where I am at,' and he hung up. . . . Q. And after that, did you write a complaint to the Grievance Committee? A. Yes, sir; I wrote the Bar Association. A gentleman called me up and said his name was Mr. Wescoat. He was secretary and attorney for the Grievance Committee of the Bar Association, and he said, 'Your letter says "Mr. Lee;" which Mr. Lee do you mean? There are three Mr. Lees there.' He named the three of them. So I said, 'The fellow I know is the man I have always done business with. He came up to our place on several occasions and was down to court. I think they call him Frank Lee. I always called him Mr. Lee.' The next I heard, a young lady called up and asked me to come down the following Friday at two o'clock, and I went down to Mr. Wescoat's office. I sat down there, and in about fifteen minutes they called me in, and this Mr. Wescoat began to tell the Grievance Committee that I had charged being double-crossed by Mr. Frank Lee, and he pointed to Mr. Frank Lee. I said, 'That is not the man I mean. I mean this Lee here (indicating); that is the man I know as Frank Lee.' He (Wescoat) said, 'Well, we have to change it, because that man's name is John Lee.' Then Mr. Wescoat said, 'We will have to withdraw the charges as to Frank Lee.' I said, 'That is perfectly satisfactory.' . . . I put my case before the Grievance Committee, they heard my story and that was all."

Cross-examination: "Q. Now, do you ever recall seeing Frank Lee, the present plaintiff, during the years you were doing business with Gatewood & Lee? A. Which Lee do you mean? A. Frank Lee, this gentleman here (indicating)? A. No, sir; not until we had the Bar Association meeting. Q. That was the first time? A. That was the first time I ever remember seeing him. Q. You had never seen him at the office of Gatewood & Associates, and he had never come up to see you? A. No, sir. . . . Q. During all that entire conversation you did not ascertain the name, the first name, of the man that came out to see you? A. No, sir. Q. It was mentioned? A. I think it was mentioned. I think he said his name was Frank Lee. Q. Did you call him Frank at that time? A. No, sir. Q. When you wrote the letter to the Bar Association, you say you knew then his name was Frank Lee? A. No. Q. Did he tell you what his name was? A. I told you I understood he said his name was Frank Lee. Q. If you understood his name was Frank Lee, why didn't you put the name of Frank Lee in the letter you sent to the Bar Association? A. I thought there was only one Mr. Lee, and I was making the complaint against Mr. Lee, with whom I was doing business. Q. You know when you are making a charge in a letter against a lawyer

you have to show the full name? A. No, sir. If you charge Fuetterer of the Fuetterer Battery Service, there would be only one charged. I would be the one. Q. You charged that Mr. Lee double-crossed you? A. Yes, sir; that is correct. Q. And that the man whom you have charged told you his name was Frank Lee? A. Yes, sir; I think that is what he said. Q. Why didn't you put 'Frank' in that letter? A. I knew only one Lee, and 'Mr. Lee, of Gatewood & Lee,' would catch him. Q. You knew the first name, and that was Frank? A. I thought he said Frank Lee, when he was in my place of business. Q. You thought he said it? A. Yes, sir. Q. You had a mere thought on the subject? You said, when this man came into your place, you thought he said his name was Frank Lee? A. When the gentleman came to my office, he said to me—to the best of my recollection—'My name is Frank Lee.' Q. If that, being the best of your recollection, I will ask you to state to the court and jury why you didn't put in the name of Frank Lee in that letter? A. Because I didn't think it made any difference. When I wrote to the firm of Gatewood & Lee, and knew only one Mr. Lee, it couldn't be mistaken for anybody but the Mr. Lee that was in my place. Q. Did you try to ascertain if there was more than one Mr. Lee? A. I had no reason—No, I did not. Q. You made that change against Mr. Lee, without designating what particular Lee it was, by his Christian name; that is true? A. That is true. . . . Q. You mean to tell this jury that Mr. Lee was your personal attorney? A. Yes, sir; in our commercial matters. Q. And you were acquainted with him? A. Yes, sir. Q. And didn't know what his first name was? A. Yes, sir; that is true. Q. When you wrote that letter to the Bar Association, you had a call on the telephone from Mr. Wescoat, the secretary of the Bar Association? A. Yes, sir. Q. And then he asked you what Lee you meant, and told you there was several Lees associated with Gatewood & Associates? A. That is correct. He told me there were three of them. Q. And then you told Mr. Wescoat that the name of the man who came to see you was Frank Lee? A. Not in those words, I didn't. I told him the man who called to see me was Mr. Lee, who handled all my commercial affairs, and I think he said his name was Frank Lee. Q. And Mr. Wescoat told you there were three—. A. Yes, sir. That was the first time I ever knew there was any more than one Lee. Q. When you told Mr. Wescoat that the name of the party you wanted charged was Frank he told you, did he not, he would make the charge against Frank? A. No, sir; he didn't tell me that. I didn't know what they were going to do. Q. You told him, in all events— A. I told him that the man who called on me was the man who handled my business, and I know him as Mr. Lee, and thought his name was Frank Lee, and if they would call up Gatewood & Lee, who handled Fuetterer's business, they will get the correct name. Q. Did you tell him you thought

this man's name was Frank? A. Yes, sir. I didn't think that a firm that was doing business with me four years would switch names. Q. So when he inserted the name Frank Lee, he did that with your authority? A. Not with my authority. I didn't know what he was going to do with the name. Q. When you wrote that letter, what was your purpose in writing the letter? A. To bring the man before the Bar Association so that they would reprimand him for doing something that was crooked in his profession. Q. You wanted to have that man, if possible, disbarred by the Association? A. I didn't say I wanted him disbarred, but I wanted him brought before the Bar, to hold his ideals high. Q. You wanted these charges against Mr. Lee, made in that letter, brought before the Bar Association Grievance Committee, and wanted him punished for it? A. I wrote that letter to the Bar Association and I wanted him reprimanded— (Previous question repeated to witness). Q. Is that correct? A. Yes, sir; that is correct, and I would do it again, too. Q. What did you expect to gain by having Mr. Lee punished? A. I wanted it, because I wanted the reputation of the lawyers held in the highest esteem by the public, so that when they hire a lawyer they feel that they are hiring a man of the highest quality, and I didn't want it dragged through the dirt. Q. Did you expect, Mr. Fuetterer, when you brought that charge, you would succeed in knocking out the claim of the Cincinnati Storage Battery Company? A. No, sir, I knew the claim was done for. I knew I was hooked. I wanted to raise the lawyers' standing in our society. . . . Q. Do you recall that Mr. Wescoat told you that the complaint would not lie against Frank Lee, as Frank Lee didn't bring the (Cincinnati Storage Battery Company) suit; he told you that? A. No, he didn't tell me that. Q. You heard him so state? A. Yes. Q. That is not true? A. No, sir. Q. Then you heard him also say, 'This is the case of Frank Lee, that is the name he told me, but now the name has to be changed to John Lee?' A. You never heard him state that. When I got up, I said, 'That is not the man; this is the man.' Q. You heard the name was changed from Frank Lee to John Lee? A. Yes, sir. Q. And the complaint proceeded against John Lee? A. My complaint proceeded against Mr. Lee of Gatewood & Lee. Q. You identified the man as John Lee— A. I identified him as Frank Lee. Q. You identified him, anyhow? A. Yes, sir. . . . Q. You know that that charge against him was dropped? A. There was never a charge against that man. Q. You now say you have no complaint of any character, good, bad or indifferent, to make against Frank Lee, the plaintiff in this case? A. The only complaint I have to make is against that man I knew as Frank Lee, who I afterwards learned was John Lee. Q. That man, sitting there, the plaintiff in this case, did not double-cross you? A. No, sir; I don't even know him. Q. He didn't

attempt to deceive you in any way? A. No, sir. Q. You ascertained the identity of the man that came out to see you at the hearing of the Bar Association; you found out the man at the Bar Association? A. Yes, sir. Q. You now say Frank never came to see you? A. Yes, sir. Q. And never did a thing to you? A. Didn't even know him; never saw him in my life. Q. Kindly tell the jury, did you ever apologize to that man for having brought him before the Bar Association? A. The man I knew as Frank Lee, afterwards, I learned to be John Lee? No, I never apologized. Q. You didn't think he was entitled to it? A. I think he did me a grave injustice. Q. Frank Lee? A. The man I know as John V. Lee now. Q. But Mr. Frank Lee never did you any injustice? A. I didn't know him. Never saw him before this case. Q. You never wrote him a letter to apologize, or offering to apologize, in any way, for bringing him into this? A. I never brought him into any trouble. He brought this suit himself. Q. You never had anything to do with it? A. I never had anything to do with this suit. . . . Q. Mr. Fuetterer, you never once consulted with Lee, or anybody in the firm of Gatewood & Associates, about the claim you thought you had against the Cincinnati Storage Battery Company? A. I talked that over with them. Q. I mean prior to the time of Mr. Lee coming out to see you? A. No, I never talked it over with them. Q. You had no purpose, whatsoever, of employing Gatewood, or any member of this firm, to represent you in this claim? A. I hadn't given it a thought who I was to employ. Q. You had spoken to Spencer about the matter? A. I had spoken to several men about the matter. Q. Then you figured out, when you talked to Mr. Lee, who came to see you, you were not willing to give the firm the claim; what you said to him, or at least when he came out to see you, and you couldn't compromise, you figured he would drop the case? A. He didn't try to compromise. He told me I had a good case.''

Re-direct examination: ''Q. When you wrote this letter (to the Grievance Committee), did you believe all the statements contained in that letter to be true? A. Yes, sir. Q. And you wrote that letter for the purpose stated in the letter, did you? A. Yes, sir.''

Mr. John V. Lee testified, on behalf of plaintiff, that the first time he met the defendant Fuetterer was in the office of Mr. Wescoat, at the hearing of the complaint against Frank Lee before the Grievance Committee of the Bar Association. The witness denied very positively that he had ever called at the office or place of business of the defendant Fuetterer, and that he had ever told Fuetterer, at any time or place, that his name was Frank Lee. The witness, John V. Lee, further testified that he had never had any conversation whatsoever with Fuetterer, and that he had never transacted any business, legal or otherwise, for Fuetterer, prior to the hearing before

the Grievance Committee, which hearing witness attended solely as the attorney and legal representative of his brother, Frank Lee.

Miss Celeste Glossmeyer, a witness on behalf of plaintiff, testified that she was employed as a stenographer by the corporate defendant during a part of the years 1923 and 1924, and that "Mr. Fuetterer and Miss Greene (defendants) came to me one day, and it was either in December, 1923, or January, 1924, and Mr. Fuetterer wanted me to make a statement before the Bar Association that Mr. Frank Lee had come to the office and he had been shown all the papers and all the correspondence in the case of the Cincinnati Storage Battery Company. I told Mr. Fuetterer I wouldn't do it, because it was a lie. Miss Greene said, 'Mr. Fuetterer has been good to you and me, and that is the least you can do for him, to make a statement before the Bar.' I said, 'I will not make the statement, because it is a lie. You can go ahead and do what you want to, but I won't make a statement.' " On cross-examination, the witness admitted that there had been some trouble between witness and the defendant, Estelle Greene, and that they were not friendly. Both Mr. Fuetterer and Miss Greene positively denied the conversation related by the witness, and defendants' evidence was to the further effect that Miss Glossmeyer left the employ of the corporate defendant on the day before Thanksgiving, in November, 1923, prior to the call of Mr. Lee at defendant's office, and was not employed by the corporate defendant during any part of December, 1923, or thereafter.

The defendant, Estelle Greene, testified that a Mr. Lee (who was identified by Miss Greene on the trial as John V. Lee) called at the office and place of business of the Fuetterer Company in the latter part of December, 1923, or the first part of January, 1924, and discussed "the matter of the Cincinnati Storage Battery Company" with the defendant, William E. Fuetterer; that the Mr. Lee who called on Mr. Fuetterer said, in introducing himself at the time of his call, "I am Mr. Frank Lee."

The defendant, Henry H. Spencer, categorically denied that he had told the plaintiff, at any time, that he (Spencer) was "going to get him" (plaintiff) because of the assignment of the account or claim of the Cincinnati Storage Battery Company to Vourdon Fricke. Mr. Spencer further testified that he, personally, was opposed to the filing of the complaint against plaintiff with the Grievance Committee of the Bar Association, because he deemed it an "impractical method of presenting" the matter.

Mr. Clarence Wescoat, secretary of the Grievance Committee of the St. Louis Bar Association, testified with respect to the letter received by the Grievance Committee, and the hearing before the committee thereon, as follows:

"Upon receipt of this letter, and upon reading it, I saw that the name of the party complained of was not sufficiently clear so that

I might investigate it. I called Mr. Fuetterer by telephone and told him his letter read, 'Mr. Lee,' and I knew there were at least two Lees with W. O. Gatewood & Associates, and I asked him which one of those Lees he intended this letter to apply to, and he told me, 'Frank Lee,' and I thereupon inserted the word 'Frank' upon the letter. Q. Was there anything said by Mr. Fuetterer at that time with reference to having a hearing of this charge against Frank Lee? A. Well, I don't know whether he said anything about a hearing. Of course, I told him we would have to know the name of the attorney before we could have a hearing, or take any action whatever. Q. Then he told you the only man was Frank? A. Yes, sir. Q. And, after that, you inserted the name 'Frank' in the letter? A. Yes, sir. . . . Of course, after the committee had assembled, and Mr. John V. Lee and Mr. Frank Lee came into the office, I think I stated this: That Mr. Frank Lee was the respondent, as we called him, and that he was represented by his brother, John V. Lee. Mr. Fuetterer then pointed to John V. Lee and said, 'This is the man that came to see me,' or something of that sort, and then, of course, I explained to the committee, and to Mr. John V. Lee and Mr. Frank Lee, why I had inserted the word 'Frank' in this letter that has just been read. I told them I had called Mr. Fuetterer over the telephone and told him there were at least two Lees in Gatewood & Associates—I only knew two, John and Frank—and I asked him which one he meant, and he said, 'Frank.' Q. When you made that statement, in the presence of Mr. Fuetterer and the members of the Grievance Committee, did Mr. Fuetterer deny or admit that he made that statement to you? A. Yes, sir; he didn't deny it, no. Q. After the statement was made by Mr. Fuetterer that the person he meant to charge with the complaint he had made was not Frank Lee, but John Lee, what then became of the complaint against Frank Lee? A. There wasn't any complaint against Frank Lee then. Q. What was done with it? A. My record here shows that the complaint was amended to describe John V. Lee, and not Frank Lee. Q. Then there was no further investigation of the complaint against Frank Lee by the Grievance Committee? A. No; none whatever. Q. As a matter of fact, the complaint against him will not be considered by the Association? A. There is no complaint against him. Q. The only complaint now is against John V. Lee, is that correct? A. Yes, sir.''

Cross-examination: ''Q. Of course, when you received this letter which mentioned Mr. Lee you called up Mr. Fuetterer; when you talked to Fuetterer, you say he said it was Frank Lee? A. Yes. Q. Or did he say, 'I think he said his name was Frank Lee,' or something to that effect? Are you sure he said 'Frank Lee,' a positive statement, or he said, 'I think he said it was Frank?' A. I think it

was a positive statement. Q. Are you sure of that? A. That is two years or more ago, and you can't expect me to remember telephone conversations that long ago. Q. It is possible that Fuetterer said, 'I think he said his name is Frank Lee?' A. It is possible.''

One of the members of the Grievance Committee testified that the two brothers, Frank Lee and John V. Lee, appeared before the committee at the same time, and that ''they looked a good deal alike,'' from which testimony it may fairly be inferred that it might be difficult, for one having a merely casual or slight acquaintance with the two Lee brothers, to distinguish or identify one brother from the other.

The insertion of the name ''Frank'' in the defendants' letter of February 12, 1924, addressed to the Grievance Committee of the St. Louis Bar Association, was done by Mr. Wescoat in lead pencil writing, above a caret, in one sentence, or paragraph, only of the letter, thus: ''For many years the firm of W. O. Gatewood & Associates, International Life Building, have been handling legal business for me, and I have become rather well acquainted with
    Frank
Mr. ʌ Lee of that firm and have considered him my personal attorney in commercial matters.''

I. Appellant assigns error in the action of the trial court in permitting the defendants, W. E. Fuetterer Battery & Supplies Company and William E. Fuetterer, to file an amended answer, during the course of the trial, over the objection and exception of plaintiff. Appellant claims that the amended answer so filed by the aforesaid defendants substantially changed the defense interposed by the original answer of defendants, which original answer was a general denial only of the averments of plaintiff's petition.

The record herein shows that the trial of the action was begun on April 20, 1926, and that the first witness on behalf of plaintiff was Mr. Clarence F. Wescoat, the secretary of the Grievance Committee of the St. Louis Bar Association. During the course of the direct examination of the witness, Wescoat, and on the first day of the trial, an objection was interposed on behalf of defendants to the introduction in evidence, by plaintiff, of the letter written by defendant, William E. Fuetterer, dated September 12, 1924, and addressed to the Grievance Committee of the St. Louis Bar Association, after the insertion of the name ''Frank'' therein was made by interlineation by Mr. Wescoat, upon the ground that the petition does not aver that defendants authorized Mr. Wescoat to insert and interline the name ''Frank'' in the letter written by defendant, and that the letter alleged to have been written of, and concerning, the plaintiff, Frank Lee, as pleaded in the petition, was not in fact the letter

written by the defendant, and published by reason of the delivery of such letter to the Grievance Committee of the Bar Association. Upon the overruling of such objection by the trial court, counsel for defendants thereupon stated to the court: "In view of the court's ruling, I ask leave at this time to be permitted to file an amended answer;" to which request the court replied: "Very well, I will give you until tomorrow morning to file amended answers." No protest or objection whatsoever is shown by the record to have been made at that time by plaintiff's counsel to the granting of such leave by the court. On the next day, April 21, 1926, the defendants filed the amended answer in pursuance of the leave granted on the day before, and while the first witness, Mr. Wescoat, was yet testifying. Counsel for plaintiff interposed an objection to the filing of the amended answer, not, however, upon the ground now urged on appeal, namely, that the amended answer substantially changed the defense, but upon the wholly different ground that the amended answer defectively, imperfectly, or improperly, pleaded and set forth the matters of defense. It was not suggested to the court by counsel that plaintiff was surprised by the filing of the amended answer, or did plaintiff request a continuance or adjournment of the trial. No motion was made by plaintiff to strike out any portion of the amended answer, or was any motion made to require defendants to make the answer more specific, definite and certain, or was any motion made, or pleading filed, otherwise attacking the amended answer. On the contrary, plaintiff filed at that time a reply, denying generally each and every allegation of fact contained in said amended answer. Upon such pleadings, the trial proceeded without objection of any of the parties, and was terminated on April 23, 1926, two days after the filing of such pleadings.

The Civil Code of this State (Sec. 1274, R. S. 1919) provides: "The court may, at any time before final judgment, in furtherance of justice, and on such terms as may be proper, amend any . . . pleading, . . . by inserting other allegations material to the case," etc. It is the recognized and universal policy of the law that courts should be liberal in allowing amendments to pleadings, in furtherance of justice, and the statute, supra, by its very langugage and intent, clearly recognizes and expresses such policy of the law. In view of the foregoing statute, and the universal policy of the law expressed therein, it has repeatedly been ruled that the courts should, at least, be as lenient and liberal as the statute in permitting amendments to pleadings to be made before final judgment and in furtherance of justice. [Carr v. Moss, 87 Mo. 447, 450; Wright v. Groom, 246 Mo. 158, 163.] It is said that amendments are favored by the courts, as tending to avoid delay in joining issue on the true

merits of a cause and to bring litigated controversies to an end, and that the rule is to allow amendments, rather than to refuse them. [Wright v. Groom, supra; House v. Duncan, 50 Mo. 453; Corrigan v. Brady, 38 Mo. App. 649, 657.] At common law, the amendment of pleadings was regarded as a matter so exclusively addressed to the discretion of the trial court that its allowance or refusal, as the case might be, could not be reviewed upon writ of error or appeal. [1 Ency. Pleading & Practice, p. 524.] The section of our Civil Code, supra, is merely declarative and in aid of the common law. Hence, it has been uniformly ruled by this court that it is discretionary with the trial court to permit amendments to pleadings to be made out of time and before final judgment, in furtherance of justice, unless there be a clear departure from, and substantial change in, the original claim or cause of action, or defense. Such discretion of the trial court is rarely interfered with by the appellate courts of this State, and then only when the trial court has palpably abused the discretion in permitting, or in refusing, the amendment to be made. [Wright v. Groom, supra; Allen v. Ranson, 44 Mo. 263, 267; Joyce v. Growney, 154 Mo. 253, 263; Clark v. Railway Co., 127 Mo. 255, 269; Little River Drainage District v. Railroad Co., 236 Mo. 94, 113.]

We are of opinion that the amended answer made no substantial change in the defense, and worked no harm or prejudice to the plaintiff and appellant herein. Nor can we say (especially in view of the fact that the record discloses that no objection to the filing of the amended answer was interposed by plaintiff upon the specific ground that the amended answer changed the original defense) that the trial court palpably abused its discretion in permitting the filing of the amended answer. Furthermore, it is the established rule that "an objection to the allowance of an amendment should be made when leave to amend is asked, and, in order to avail himself of error in granting the amendment, the party objecting should stand on the ruling, since he waives the objection by pleading to the amendment, or by going to trial thereon, or by otherwise recognizing the amended pleading." [31 Cyc. 751, 752; Ingwerson v. Railway Co., 205 Mo. 328. 336; Grymes v. Mill & Lumber Co., 111 Mo. App. 358, 362, and cases there cited; Sanguinett v. Webster, 153 Mo. 343, 367; Liese v. Meyer, 143 Mo. 547, 556.] Appellant's assignment of error must be denied.

II. It seems, however, to be urged by appellant that the trial court erred in permitting the amended answer to be filed by defendants for the reason, and upon the ground, that the matter set out

in the amended answer could only have been pleaded in mitigation, and not by way of justification, and that the plea of privilege set out in the amended answer is defective and imperfect in that such plea does not set forth sufficient facts to show that the writing and publication of the alleged defamatory letter by defendants was privileged, but merely states the legal conclusion that the letter was a privileged communication. It seems also to be urged by appellant that the pleas of justification and of privilege, which are separately stated and set out in the amended answer, are inconsistent with the plea of the general issue, or general denial, also pleaded in the amended answer.

We think that appellant has misconceived the purport and legal effect of the matter pleaded in the amended answer. We do not view such matter as pleaded in mitigation, or as intended by the pleader as and for a plea in mitigation; on the contrary, we regard and view such matter of the amended answer as a plea of justification, together with a separately stated plea of privilege. Nor can we agree with appellant's insistence and contention that the matter of the amended answer constitutes mere matter of mitigation, and that such matter can only be pleaded in mitigation, and should have been so pleaded.

Our Code of Civil Procedure is liberal with respect to the defenses available to an answering defendant, and specifically prescribes that "the defendant may set forth by answer as many defenses and counterclaims as he may have, whether they be such as have been heretofore denominated legal or equitable, or both." [Sec. 1233, R. S. 1919.] It seems to be the general rule, almost of universal application, that a plea of justification and a plea of privilege are not inconsistent with a general denial, or with a plea of the general issue, and that all such pleas or defenses may be joined in one answer, provided they be separately stated. [37 C. J. 39, 40.] Such seems to be the uniform rule in our own State and jurisdiction. [Nelson v. Brodhack, 44 Mo. 596, 599; Nelson v. Wallace, 48 Mo. App. 193, 198; Wood v. Hilbish, 23 Mo. App. 389, 397.]

But assuming (without so holding) that the separate pleas of justification and of privilege are imperfectly stated and pleaded in the amended answer, and that either of such pleas is inconsistent with the general denial pleaded in the amended answer, the record discloses that plaintiff filed no motion to require defendants to elect as between the several defenses pleaded, or to strike any of the defenses or pleas from the amended answer, or to require any of the defenses or pleas to be made more specific and definite. On the contrary, plaintiff elected to plead over to the amended answer by filing a reply thereto, and to proceed with the trial upon the pleadings filed. By

so doing, the plaintiff and appellant has waived the inconsistencies and deficiencies, if any there be, in the amended answer, and will not be heard on appeal to urge such matter as ground for reversal of the judgment below. [31 Cyc. 719, 727; Stark v. Knapp & Co., 160 Mo. 529, 552; Rinard v. Railway Co., 164 Mo. 270, 285; Harper v. Fidler, 105 Mo. App. 680, 690; Broyhill v. Norton, 175 Mo. 190, 202.] Such imperfections and deficiencies in pleading are "cured by verdict," under our Statute of Jeofails. [Sec. 1550, R. S. 1919.]

III. Error is assigned by appellant in the action of the trial court respecting the giving and the refusal of certain instructions. It is urged that the giving to the jury of defendants' instruction numbered 6 constitutes reversible error. Such instruction reads:

"The court instructs the jury that if you find and believe from the evidence that the plaintiff Frank Lee was the one who came out to see defendant Fuetterer about the claim of the Cincinnati Storage Battery Company, and if your further find that at that time W. O. Gatewood & Associates were representing defendant W. E. Fuetterer Battery & Supplies Company, and that said Frank Lee was employed by Gatewood & Associates who called on defendant W. E. Fuetterer about the claim of the Cincinnati Storage Battery Company, and that said Frank Lee then and there told the said Fuetterer that, on account of the representation of the Fuetterer Battery & Supplies Company by Gatewood & Associates that Gatewood & Associates could not act for the Cincinnati Storage Battery Company if the claim was going to be contested, and that said defendant Fuetterer relying upon said statements of said Frank Lee and the confidential relation existing between defendant Fuetterer Company and said Gatewood & Associates, if any, and told the said Frank Lee that the defendant Fuetterer Company had a claim against said Cincinnati Storage Battery Company for breach of contract and would interpose a claim against said Cincinnati Storage Battery Company for more than the claim of the Cincinnati Storage Battery Company against the Fuetterer Battery & Supplies Company, would not have to file suit in Cincinnati and send witnesses there, and that said Fuetterer gave said information only to Mr. Frank Lee, and that after said Mr. Frank Lee so acquired said information the claim of the Cincinnati Storage Battery Company was assigned to Vourdon Fricke and that said Fricke was then and there an employee of said W. O. Gatewood & Associates and that suit was filed by said Fricke as assignee of the Cincinnati Storage Battery Company, and that defendant W. E. Fuetterer Battery & Supplies Company was on account of said assignment precluded from asserting its claim against said Cincinnati Storage Battery Company, in said suit, your verdict must be against the plaintiff."

The obvious purpose of the foregoing instruction was to submit to the jury the issue of justification, which issue is raised and presented by defendants' amended answer. The complaint made by appellant against the instruction is that the instruction "is not within the issues in the case, is contradictory of the evidence, and is neither based upon the pleadings nor the evidence." To our minds, the instruction is well within the issues raised and joined by the pleadings in the cause; and the record discloses ample and sufficient evidence upon which to predicate a finding of the jury respecting each and all of the several hypotheses of the instruction. Appellant's chief argument against the instruction seems to be grounded upon the testimony of the defendants, William E. Fuetterer and Estelle Greene, in which said defendants identified John V. Lee as the individual who called upon Fuetterer respecting the claim of the Cincinnati Storage Battery Company, and upon the testimony of said defendants that the plaintiff, Frank Lee, had never, at any time, called at defendants' office and place of business, and that defendants had never, at any time, transacted any business, legal or otherwise, with the plaintiff, Frank Lee. However, the plaintiff, Frank Lee, testified quite positively that he was the individual who "handled the claim" of the Cincinnati Storage Battery Company against the corporate defendant, and who called upon the defendants respecting such claim. The plaintiff's brother, John V. Lee, was equally positive in his testimony on the trial of the plaintiff's action, which testimony was to the effect that John V. Lee had no acquaintance or transactions whatsoever with defendant Fuetterer prior to the publication of the letter written by Fuetterer to the Grievance Committee of the Bar Association. The defendant, Estelle Greene, testified that the Mr. Lee who called upon defendant Fuetterer, respecting the Cincinnati Storage Battery Company claim, introduced himself as Mr. Frank Lee, and the defendant Fuetterer testified that he thought the individual who called at Fuetterer's place of business said that his name was Frank Lee. There is some testimony to the effect that the two Lee brothers, Frank and John, "looked a good deal alike." It cannot seriously be disputed that the evidence clearly shows that the law firm of W. O. Gatewood & Associates had handled several accounts for collection on behalf of the defendant, Fuetterer Battery & Supplies Company, prior to the date on which some individual representative of W. O. Gatewood & Associates called upon the defendant William E. Fuetterer, respecting the Cincinnati Storage Battery Company claim, and that W. O. Gatewood & Associates were yet handling some collection matters for, and on behalf of, the corporate defendant on and after the date on which the alleged defamatory letter to the Grievance Committee of

the Bar Association was delivered and published. According to the testimony of plaintiff, he was an employee of the law firm of W. O. Gatewood & Associates, and, as such employee, "had charge of cases that came into the office from out-of-town clients," and "himself handled the claim of Cincinnati Storage Battery Company [obviously, an out-of-town client] against William E. Fuetterer" and the corporate defendant, and, in the course of his employment and duties, he went to see Fuetterer at the latter's office and place of business as the individual representative of his employers, W. O. Gatewood & Associates. It is true that plaintiff denies that, on the occasion of such call, he made the statements and remarks attributed to him by defendant Fuetterer. However, plaintiff admitted by his own testimony that Fuetterer "told me that . the Cincinnati Storage Battery Company owed him more money than he owed them," and that the claim or account of the Cincinnati Storage Battery Company against the corporate defendant was assigned to Vourdon Frike, an employee of W. O. Gatewood & Associates, for the purpose of protecting plaintiff, or his employers, W. O. Gatewood & Associates, in the collection of a fee for handling such claim or account. While there is considerable conflict in the testimony of the parties, and their respective witnesses, we think there is substantial evidence in the record upon which to warrant the submission of, and a finding of the jury upon, each of the several hypotheses of the defendants' Instruction No. 6. It was for the jury, as the exclusive triers of the facts, to reconcile and settle the conflicts and differences in the evidence, in arriving at their verdict. We perceive no reversible error in the giving of such instruction.

Appellant complains of error in the refusal of plaintiff's requested Instruction E, which reads, in part, as follows: "At the close of all the evidence in the case, the court instructs the jury that, under the evidence and the law in this case, plaintiff is entitled to recover against those defendants whom you may find and believe from the evidence combined and confederated together for the purpose of injuring plaintiff by the means and methods mentioned in the evidence, or who thereafter entered into such plan and purpose (if any), and *your verdict must be for plaintiff.*" [Italics ours.] The instruction then directs the jury as to the measure of plaintiff's actual damages. The requested instruction is unquestionably peremptory and mandatory in form and character, and directs a verdict for plaintiff. The requested instruction was properly and rightly refused by the trial court. It has been ruled by this court that "it is now well settled that a trial court has no power to direct a verdict for plaintiff in an action for libel, though it may compel a nonsuit or direct a verdict

for defendant in a proper case." |Patterson v. Evans, 254 Mo. 293, 303; Heller v. Publishing Co., 153 Mo. 205, 214.|

Appellant complains of error in the refusal of plaintiff's requested Instruction I, which reads: "You are instructed that, in this case, there is no justification pleaded, but only a general denial and a plea of mitigation, and the publication is admitted in the pleadings, and under the law matter in mitigation is not a defense against actual damages sustained by one who has been defamed, and such matter in mitigation can only be considered by the jury by way of reducing punitive damages."

The trial court committed no error in refusing such instruction. The refused instruction is grounded upon a misconception of the matter pleaded in defendants' amended answer. The matter pleaded in the amended answer constitutes a plea of justification, and a separately stated plea of privilege. The amended answer, in our opinion, does not plead matter of mitigation.

Error is assigned in the refusal of plaintiff's Instruction H. The error, if any there be, in the refusal of such instruction was not called to the attention of the trial court by any assignment of plaintiff's motion for a new trial, or by any reference to the refused instruction, general or specific, contained in such motion. Error respecting instructions not called to the attention of the trial court for correction will not be reviewed by the appellate court on appeal. An examination of the refused instruction on our part, however, leads us to the conclusion that the instruction was properly refused.

Other errors are formally assigned, but such assigned errors are not discussed or referred to in appellant's printed brief and argument, and will be treated as abandoned. Our attention is directed to no reversible error herein, and we find none in the record before us.

IV. Notwithstanding our conclusion that the judgment *nisi* should be affirmed because we find no reversible error to have been committed by the trial court, we are also of the opinion that, upon the pleadings and the evidence herein, the verdict and judgment are for the right parties, and therefore the judgment *nisi* should be affirmed. This, for the reason that we deem the publication of the defendants' letter, addressed and delivered to the Grievance Committee of the St. Louis Bar Association (which letter is in the nature of a complaint respecting a grievance claimed to have been suffered by the writer and publisher of such letter), to be qualifiedly privileged (that is to say, the occasion of the publication of such letter was such as to render the publication qualifiedly privileged), and we find no substantial evidence in the record of express, or actual, malice on the part of defendant Fuetterer, in the writing and publication of such letter.

Privileged publications are said to be of two kinds, or classes: (1) Those which are "absolutely privileged," and (2) those which are conditionally or "qualifiedly privileged." The former term, or classification, has reference to words spoken or written in the course of certain legislative, executive, or judicial proceedings, and such class of privileged publications is not involved in the present action. The latter term, or classification, is defined as "a publication made on an occasion which furnishes a prima-facie legal excuse for the making of it; and which is privileged, unless some additional fact is shown which so alters the character of the occasion as to prevent it furnishing a legal excuse." [Townshend on Slander & Libel (4 Ed.) sec. 209.] The same learned text-writer furthermore says: "Privileged communications comprehend all statements made bona-fide in performance of a duty, or with a fair and reasonable purpose of protecting the interest of the person making them, or the interest of the person to whom they are made. A communication made bona-fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contain criminatory matter, which, without this privilege, would be slanderous and actionable. But in this definition of a privileged communication, the word *duty* 'cannot be confined to legal duties, which may be enforced by indictment, action, or mandamus, but must include moral and social duties of imperfect obligation.' . . . The right to seek redress is not limited to seeking it in a court of justice. Every one who is aggrieved, or who has reasonable and probable cause to believe himself aggrieved, may, in good faith, seek redress from any body, officer, or individual, having jurisdiction, power, or authority to redress the wrong or supposed wrong. Whatever is spoken or written in such a pursuit for redress is privileged." [Idem., secs. 209 and 237.]

In 36 Corpus Juris, 1241, it is said: "Qualified privilege exists in a larger number of cases than does absolute privilege. It relates more particularly to private interests; and comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, upon a subject-matter in which the author of the communication has an interest, or in reference to which he has a duty, public, personal, or private, either legal, judicial, political, moral, or social, made to a person having a corresponding interest or duty. Briefly stated, a qualifiedly privileged communication is a defamatory communication made on what is called an occasion of privilege without actual malice. As to such communications there is no civil liability."

In Waring v. McCaldin (Ire.), 7 Ire. C. L. 282, FITZGERALD, B., speaking for the Court of Exchequer, one of the superior courts in

Ireland, thus aptly announces the rule or principle of law respecting privileged occasions and publications: "The occasion of making a defamatory communication is thus privileged—when it is made by one having an interest in making, or a duty to make, that particular defamatory communication (the interest or duty is in respect of the subject-matter of the communication, as distinct from the mere form of expression of language), to one having a corresponding interest or duty in respect of that subject-matter—that is to say, who has an interest in hearing, or a duty to arise upon hearing, such defamatory communication. . . . If, without express malice, I make a defamatory charge, which I bona-fide believe to be true, against one whose conduct in the respect defamed has caused me injury, to one whose duty it is, or whose duty I reasonably believe it to be, to inquire into and redress such injury, the occasion is privileged, because I have an interest in the subject-matter of my charge, and the person to whom I make the communication has, on hearing the communication, a duty to discharge in respect of it."

In Sullivan v. Commission Co., 152 Mo. 268, 277, this court quoted approvingly from Newell on Slander & Libel (2 Ed.) pp. 388 to 391, as follows: "A privileged communication is one made in good faith upon any subject-matter in which the party communicating has an interest or in reference to which he has, or honestly believes he has, a duty, to a person having a corresponding interest or duty, and which contains matter which, without the occasion upon which it is made, would be defamatory and actionable. Every defamatory publication prima facie implies malice, but where a communication is made in good faith, upon any subject-matter in which the communicant has an interest or in reference to which he has a duty, legal, moral or social, to a person having a corresponding interest or duty, it is privileged, and the privilege rebuts the presumption of malice, and the burden of proof is cast upon the plaintiff to prove express malice."

In a very recent case, State ex rel. Zorn v. Cox, 318 Mo. 112, 118, 298 S. W. 837, 840, Division Two of this court said: "The article (i. e., the publication) was therefore prima-facie qualifiedly privileged, for the above cases (cited) hold to the principle that a publication is prima-facie qualifiedly privileged where circumstances obtain with respect to a right or duty to communicate to others what of right they ought to know, even though it is not a legal, but only a moral or social duty of imperfect obligation."

In McKnight v. Hasbrouck, 17 R. I. 70, 72, wherein plaintiff sought recovery of the defendant for libel, arising out of the publication of a letter, written by defendant, a medical practitioner of the State of Rhode Island, addressed and delivered to the secretary of the

1236

Homeopathic Medical Society of the State of New York, and protesting against the selection of plaintiff as an honorary member of the New York Medical Society, in which letter defendant stated of, and concerning, plaintiff that "he (plaintiff) hardly seems like one who is worthy of being upheld by a society like the New York State Society," the Supreme Court of Rhode Island thus stated the prevailing rule respecting such communications: "It is well settled that when one makes a communication in the bona-fide discharge of a duty which is, or appears to be, cast upon him by the circumstances, it is a privileged communication, and a defence to an action of libel or slander."

In Farnsworth v. Storrs, 59 Mass. (5 Cush.) 412, 415, said by text-writers to be a leading case upon the subject of privileged occasions and publications, and which was an action for libel arising out of the publication of a sentence of excommunication from a church, pronounced upon plaintiff and read to the church congregation by the defendant, SHAW, C. J., speaking for the Supreme Judicial Court of Massachusetts, said: "Churches have authority to deal with their members for immoral and scandalous conduct; and for that purpose, to hear complaints, to take evidence and to decide; and, upon conviction, to administer proper punishment by way of rebuke, censure, suspension and excommunication. . . . The proceedings of the church are quasi-judicial, and therefore *those who complain,* or give testimony, or act and vote, or pronounce the result, orally or in writing, acting in good faith, and within the scope of the authority conferred by this limited jurisdiction, and not falsely or colorably, making such proceedings a pretense for covering an intended scandal, *are protected by law.* . . . The church and congregation, to some purposes, form one religious society, associated under one pastor and minister for religious improvement. The church constitutes a select body, set apart for special purposes by covenant, and at the same time forms part of the congregation. Other members of the congregation may, upon suitable application, become members of the church, and all have a common interest in the general religious welfare of each other. . . . One great purpose of an act of church discipline is, that it may have a salutary influence upon the whole religious body, of which the offender is a member." [Italics ours.]

The law respecting privileged publication of written and oral communications was exhaustively discussed, and the leading American and English authorities dealing with the subject were thoroughly reviewed, by Mr. Justice DANIEL, speaking for the United States Supreme Court in the leading case of White v. Nicholls, 3 How. 266, 11 L. Ed. (U. S.) 591, 600, wherein the prevailing rule or principle was announced to be that a publication is conditionally, or

qualifiedly, privileged "whenever the author and publisher of the alleged slander acted in the bona-fide discharge of a public or private duty, legal or moral; or in the prosecution of his own rights or interest."

A review, on our part, of numerous juristic authorities which deal with the subject of privileged occasions and publications has not led us to the discovery of any case involving the precise question whether the publication of a complaint, or communication, submitting to a professional body, such as a bar association, for redress, a supposed grievance suffered by the communicant, is qualifiedly privileged. There may be such cases in other jurisdictions, but we have not discovered them. The precise question seems, however, to be one of first impression in our own State and jurisdiction. Upon principle, we see no reasonable or logical distinction, or difference, between a professional body such as a bar association, composed of various individual practitioners of the legal profession, and other bodies made up of various individuals having a common and mutual interest and purpose, such as corporations, churches, medical societies, merchants, bankers, or commission brokers. If the publication of a communication to a church, or to the stockholders and directors of a corporation, or to a medical society, be conditionally, or qualifiedly, privileged, as is seemingly held to be the established rule by the weight of juristic authority, then, by analogy, the rule is equally applicable to the publication of a communication addressed to a bar association, or to one of its committees, having authority to examine and inquire into the supposed grievance complained of by the communicant, and to redress such grievance, if any there be.

Professional bodies, such as bar associations and medical societies, are intimately concerned with, and have a direct and immediate interest in, the professional conduct of the various individuals who comprise the body of the profession, in order that the acts and conduct of any of such individuals, while acting in a professional capacity, or while engaged in the performance of a professional service or duty, may be such as not to bring discredit and reproach upon, or destroy public confidence and trust in, the body of the profession. If the publication of a communication, written in good faith by the author of the communication, and addressed and delivered to such a professional body, complaining of a grievance honestly believed to have been suffered by the communicant, and which grievance such professional body may have power or authority to redress or correct, be not conditionally or qualifiedly privileged, and the author of such communication be actionably liable for the publication of such communication without proof of actual or express malice on the part of the author, then few persons would have the temerity

or courage to present a grievance to such professional body for redress or correction, no matter how meritorious the subject-matter of the complaint may be, and no matter how reproachful and discrediting to the body of the profession the conduct of the individual complained against by the communicant may be. If the publication of such communications be not qualifiedly privileged, bar associations, medical societies, and like organizations of professional men and women, become mere organizations for social intercourse or the interchange of ideas.

The American Bar Association, as the national organization of the various individuals comprising the body of practitioners of the legal profession in the United States, at the annual meeting of the Association held on August 27, 1908, adopted thirty-two canons, or rules, of professional ethics, as a guide to the professional acts and conduct of the individual members of the profession. The purpose of such Canons of Ethics is thus stated in the Preamble: ''In America, where the stability of courts and of all departments of government rests upon the approval of the people, it is peculiarly essential that the system for establishing and dispensing justice be developed to a high point of efficiency and so maintained that the public shall have absolute confidence in the integrity and impartiality of its administration. The future of the republic, to a great extent, depends upon our maintenance of justice pure and unsullied. It cannot be so maintained unless the conduct and the motives of the members of our profession are such as to merit the approval of all just men.'' The sixth canon, or rule, prescribed by such Canons of Ethics, reads: ''It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel. It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose. The obligation to represent the client with undivided fidelity, and not to divulge his secrets or confidences, forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interests of the client with respect to which confidence has been reposed.''

While, of course, such canons, or rules, of professional ethics and conduct do not have the force and effect of a legislative enactment, yet they do express and reflect the ideals of professional conduct and duty which are generally recognized, and expected to be observed,

by the individuals comprising the body of the legal profession, and which ideals of professional conduct are more or less widely known to the lay public, and expected by the public to be observed by the individual members of the legal profession. Consequently, those individuals comprising the lay public, and especially those of the lay public who, in the course of business or domestic transactions, require the professional advice and services of the lawyer, owe a duty to the body of the legal profession, and to the bar association, which is the organized representative of the body of the profession, to communicate to such organized representative of the body of the profession any grievance, wrong or injury, suffered by the communicant, and arising from the relation of attorney and client, and bona-fide believed by the communicant to have been occasioned by any unprofessional or unethical act or conduct of the lawyer. It is the corresponding and correlative duty of the bar association, as the organized representative of the body of the legal profession, to examine and enquire into the subject-matter of such communication, in order that the grievance, wrong or injury, which the communicant honestly believes he has suffered by reason of the unprofessional or unethical conduct of the lawyer complained against, may be redressed or corrected.

We are therefore constrained to the view that the occasion of the publication of defendants' letter to the Grievance Committee of the St. Louis Bar Association was a privileged occasion, under the weight of juristic authority, and that the publication of such letter, or communication, is qualifiedly privileged.

The evidence herein is such that the jury were justified and warranted in finding that the subject-matter of defendants' communication or letter was true, and that the defendants, in writing and publishing such letter, had reasonable and probable cause to believe such subject-matter of the letter to be true and that they had been aggrieved because of the facts and circumstances recited and stated in such letter. The occasion and publication of such letter being qualifiedly privileged, the privilege is said to rebut the presumption of express malice implied from the defamatory subject-matter of the letter, and the burden of proof was cast upon the plaintiff to prove express or actual malice on the part of the author of the letter. [36 C. J. 1221; Peak v. Taubman, 251 Mo. 390, 419; Sullivan v. Commission Co., 152 Mo. 268, 277; Holmes v. Royal Fraternal Union, 222 Mo. 556.] No such proof was proffered by plaintiff.

We do not think that the statements made in defendants' letter are of such a malicious, unwarrantable, or exaggerated character as

to remove the publication from the protection of the privilege. The only immoderate or intemperate language used in the letter, if any, is that contained in the first sentence or paragraph of the letter, namely: "I have been *double-crossed* by a lawyer in St. Louis and I want to state the facts to you to see if you can do anything for me." The word "double-crossed" is a slang word which we do not find to be defined in any standard dictionary of the English language. We do not regard such slang word as being more opprobrious or malicious in meaning than if the author of the letter had used the proper and more refined English word "deceived." Aside from the use of the slang word "double-crossed," the statement of facts contained in the letter is couched in temperate language.

Plaintiff points to the answer of defendant Fuetterer, when cross-examined as to his purpose in writing the letter, and wherein defendant stated his purpose in writing the letter to be "to bring the matter before the Bar Association, so that they would reprimand him for doing something that was crooked in his profession," as being proof of express or actual malice on defendant's part. One of the purposes of defendant in bringing his complaint of a supposed grievance to the attention of the Grievance Committee of the Bar Association was to obtain some redress for the wrong or grievance he believed he had suffered by reason of the supposed unprofessional conduct of the individual complained against, which redress he believed would take the form of a reprimand from the Bar Association. The word "crooked," as used in the defendant's testimony, does not necessarily have any sinister or malicious meaning, but was apparently used by the witness in his testimony in the sense and meaning of the word "irregular."

Defendants requested the trial court to give the following instruction: "The court instructs the jury that the letter written to the grievance committee is privileged and if made by defendants in good faith without express malice towards the plaintiff in the belief, based upon such grounds as a reasonably prudent person would consider reasonable in the same or similar circumstances, that said statements are true, the plaintiff cannot recover and your verdict will be against the plaintiff." The court refused to give such instruction. Under the pleadings and evidence in the cause, the requested instruction rightly declared the law respecting the privileged character of the letter written to the Grievance Committee of the Bar Association by defendant Fuetterer, and the trial court erred in refusing such instruction. The weight of authority is to the effect that whether the occasion and publication of an alleged defamatory letter is privileged is a question

of law to be determined by the trial court in the first instance. [Holmes v. Royal Fraternal Union, 222 Mo. 556, 569; Wagner v. Scott, 164 Mo. 289, 302; Vanloon v. Vanloon, 159 Mo. App. 255, 271.]

The judgment *nisi* should be affirmed, and it is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion of SEDDON, C., is adopted as the opinion of the court. All of the judges concur.