CURTIS W. LONERGAN, RESPONDENT, v. M. D. LOVE, APPELLANT.—150 S. W. (2d) 534.

St. Louis Court of Appeals. Opinion filed May 6, 1941.

Motion for Rehearng Overruled May 20, 1941.

*May & May* for respondent.

1068

*A. J. Murphy, Jr., Edward A. Glenn* and *F. D. Wilkins* for defendant.

HUGHES, P. J.—Action for slander. Verdict for plaintiff for $100 actual damages and for $300 punitive damages. Defendant appeals. The amended petition charged that on the 24th day of February, 1939, in Pike County, Missouri, the defendant, willfully, wantonly and maliciously spoke to plaintiff, and of and concerning plaintiff in the presence and hearing of others, certain false, defamatory and slanderous words, as follows: "You stole my corn. You are a thief and a damn thief." Plaintiff prayed for $1000 actual damages and $1000 punitive damages.

The amended answer: (a) General denial; (b) Admitted defendant used some abusive language to the plaintiff on the date charged, but denied he used the language as set out in the petition; denied that whatever language he used on said occasion was used maliciously, or with the intent to injure the plaintiff and denied that he was damaged thereby; (c) Averred that whatever language he used on said occasion was simply language of abuse and was spoken in an outburst of passion and excitement, and was provoked by the plaintiff; and (d) That the occasion was one of qualified or conditional privilege and whatever words he used at said time related to private interests and that the same were made in good faith, without actual malice, and with reasonable or probable grounds for believing them true.

The reply was a general denial.

The parties were farmers living in the same neighborhood. Plaintiff was a man fifty-eight years old and had lived on a farm of 240 acres owned by Dr. D. M. Pearson for thirty-four years as a tenant from year to year on shares; the landlord to have one-half the crops and he the other one-half. The defendant was a man sixty-two years old and had lived on a forty-acre farm belonging to himself and wife for thirty-six years.

On April 11, 1938, Dr. Pearson sold the farm upon which plaintiff was a tenant to the defendant and his wife, and agreed to give defendant full possession on March 1, 1939, and agreed to give defendant possession of the ground upon which any corn or other crops were planted by the tenant (plaintiff) on or before September 15, 1938, and one-half of forty acres located in what is known as Mud Lick Prairie when the deed was signed transferring title to the farm. The purchasers were to have and receive all of the landlord's share of all crops grown on the farm except the wheat crop. They were also to have possession of the land then in wheat as soon as the wheat was harvested, and the right to enter upon the farm to carry on the regular farming of the land and to make repairs. As to the corn grown during the season of 1938 it was agreed between plaintiff and defendant that plaintiff would divide it by the row, taking sixteen rows for his share and leaving sixteen rows as defendant's share. There were certain pumps in use on the farm, some electric fixtures, and a kitchen sink, which plaintiff claimed belonged to him. All of these matters gave rise to friction between plaintiff and defendant during the summer as to their respective rights in the farm.

On February 24, 1939, plaintiff was moving from the farm, with the assistance of a neighbor, Charles Bollomy, who owned a truck. Plaintiff and Bollomy drove to the farm, and reaching the gate that enters to a roadway to the house from the public road, Bollomy stopped the truck on the public road and got out of the same to put chains on his truck. Defendant and his two sons were on the south side of the public road building fence.

Plaintiff testified that defendant tied his team to the fence on the inside of the pasture, about thirty or forty feet from the truck, opened the gate and came out to the truck where he and Bollomy were and without saying one other word, said, "You took sixteen rows of my corn, you stole it. You are a thief and a damned thief." That the words were said in a reasonable tone of voice and not loud. That defendant walked back to where Mr. Bollomy was and said, "I didn't call him a thief, did I?" To which Mr. Bollomy replied, "Yes, you did." That defendant's two sons were 130 yards up the road working on the fence. That the corn had been divided fifty-fifty; that from one field he took the first sixteen rows and the last sixteen rows of corn, but the other field was divided by the load, and the defendant got the first and last load from that field, and that the last

sixteen rows which he took was to offset the last load of corn given to the defendant from the other field.

Charles Bollomy testified that he was forty years old and had known plaintiff all of his life, that plaintiff's general reputation as an honest upright citizen was good. On the occasion of the alleged slander he said the first words he heard were that plaintiff asked defendant if he wanted to buy a pump that was laying near there, and defendant told him he did not, that the pump belonged to the farm, and he forbid him from moving the pump, and then one word seemed like it brought on another. That defendant said or claimed that plaintiff misdivided the corn, something to that effect, and plaintiff said he didn't, and defendant said, ''You damn liar, you stole my corn,'' and defendant told him he didn't, and defendant called him a lying, thieving son-of-a-bitch. He just called him a damned thief and he went over it two or three times, calling him a lying, thieving, son-of-a-bitch. Witness said, ''I understood him to mean a thief, that's the way I would take it. I was fastening up my chain on the left side. I had fastened the inside first, then I had to fasten it outside, and while I was doing that Mr. Love said to me, 'Bollomy, did you understand that I called him a thief?' I said, how could I help hearing it, I was in four or five feet of him.'' Defendant's two boys were up the road 140 or 150 yards. ''I would figure Mr. Love was mad from the tone of his voice. His voice was not loud, just ordinary.''

Defendant's testimony was that his two sons, Marion and Kenneth were near the gate, and heard what was said. Kenneth testified that the plaintiff asked his father if he wanted to buy the pumps and his father told him they belonged to the place; that they argued about same, also about a fence and some chicken nests; that both got ''very loud and pretty angry at one another.'' That his father told plaintiff he had been doing him dirty all along, and accused plaintiff of sending him a written notice for damages to a pasture, that plaintiff denied this and defendant called him a liar and a damn liar. That his father told the plaintiff he had taken more corn than he should have, that he took the first sixteen rows and the last sixteen rows of corn, that they continued to argue. That plaintiff said to Charlie Bollomy, ''Did you hear what Mr. Love said, he said I stole his corn,'' and Dad said, ''I didn't say you stole it, I said, you took it,'' and Lonergan said, ''I have been waiting for a chance to sue you, and now I am going to do it.'' Defendant's other son, Marion, gave practically the same testimony as his brother, Kenneth.

The defendant Love testified that when the truck came up to the gate he was repairing fence along the road close to the gate. The public road east and west and divides this farm, the buildings being located on that part of the farm south of the public road. His team was tied to the fence and when he saw the truck approaching he walked up in front of them thinking they might scare at the truck.

The plaintiff got out of the truck, came over to the mail box, looked in the same and at the time did not speak to him. That he spoke to plaintiff, remarking about the weather, to which plaintiff replied, saying, "Yes, about the same." Plaintiff then asked him if he wanted to buy a pump which was laying near by. He told him no, that they belonged to the farm and plaintiff said, "Well, I am going to take them." He then said to plaintiff, "You have told me the light fixtures belonged to the buildings and I see the porch fixtures are off, I have not been in the house and don't know what's missing out of the house." Plaintiff said, "I am going to take it." He then told the plaintiff that he had lied to him about everything, that he took the sink in the kitchen, and gave him written notice to quit plowing. Plaintiff denied that he had given him a written notice to quit plowing and he called him a damn liar, saying, "You did give me a notice, I have it to show you, I can prove it to you quick." He further testified that he said, "You can't deny taking the first and last 16 rows of that corn out there." Plaintiff said he didn't; "that you can't tell nothing about the rows," and I said, "you are a liar, you can't deny you got the first and last 16 rows of that corn, you shucked it," and plaintiff said, "You get away from here or I'll kick your damn guts out of you." He denied that he called the plaintiff a "damn thief."

Plaintiff also offered evidence of defendant's financial condition, both as to personal property and real estate. Defendant testified that all real estate which he owned was in the name of himself and wife, estates by the entirety.

Appellant's foremost contention is that by reason of the accompanying circumstances the use by him of the alleged defamatory words, which he denies uttering, come within the legal classification of a qualified privilege, and are not actionable, and hence his demurrer to the evidence should have been sustained. Such contention partakes of the nature of what may be termed a negative pregnant and although permissible in actions for libel or slander, yet, in considering the demurrer we must be guided by the evidence most favorable to plaintiff, and accord to plaintiff's evidence absolute verity and disregard all of defendant's evidence except that which is consistent with and may aid plaintiff's case. [Perdue v. Montgomery Ward & Co., 107 S. W. (2d) 12.] And when we follow this guiding precept, we find that the evidence is that at the time and place alleged the defendant uttered the defamatory words as charged, i. e. "You stole my corn. You are a thief and a damn thief." Such words are slanderous *per se* and malice is implied from the utterance thereof. [Boyce v. Wheeler, 197 Mo. App. 295, 195 S. W. 84; Starnes v. St. Joseph Railway, Light, Heat & Power Co., 52 S. W. (2d) 852.]

But defendant says the occasion was one of qualified privilege. Whether such contention is well taken is a question of law for the court. [Fisher v. Myers, 339 Mo. 1196, 100 S. W. (2d) 551; Warren

v. Pulitzer Pub. Co., 336 Mo. 184, 78 S. W. (2d) 404; Lee v. W. E. Fuetterer Battery & Supplies Co., 323 Mo. 1204, 23 S. W. (2d) 45.] And the burden is on the defendant to show privilege. [Holmes v. Royal Fraternal Union, 222 Mo. 556, 121 S. W. 100.]

Slander is "the speaking of base and defamatory words which tend to the prejudice of the reputation, office, trade, business or means of getting a living of another." [36 C. J., p. 1146, sec. 4.] But it is not the mere speaking of the words alone which give rise to an action for slander; they must be spoken in the presence or hearing of some third party; in other words, it is the publication of the defamatory words that constitutes an action for slander; and, "Publication, in the law of defamation, is the communication of defamatory matter to a third person. Since the basis of an action for defamation is damages for injury to character in the opinion of other men, in order to render defamation of any kind actionable, there must be a publication thereof." [36 C. J., p. 1223, sec. 169; Harbison v. Chicago, R. I. & P. Ry. Co., 37 S. W. (2d) 609.]

In considering the question of qualified privilege in this case, we are at the outset confronted with the fact that the publication of the defamatory words was established by proof that they were uttered in the presence and hearing of one Charles Bollomy, who had no corresponding interest whatever in defendant's grievances, whether fancied or real, against plaintiff; and there was no corresponding duty on the part of defendant to Bollomy. Bollomy was a disinterested by-stander. In order to constitute a qualified privilege the communication must be made in good faith, without actual malice, and upon a subject-matter in which the author of the communication has an interest, or in reference to which he has a duty, either legal, moral or social, to a person having a corresponding interest or duty. Absent those elements there is no qualified privilege. [Fisher v. Myers, 339 Mo. 1196, 100 S. W. (2d) 551; Garey v. Jackson, 193 S. W. 920; Sitts v. Daniel, 284 S. W. 857.] The record before us discloses none of the elements of qualified privilege. Defendant was not seeking information concerning the division of the corn. [See Atterbury v. Brink's Express Co., 90 S. W. (2d) 807.] He had made no investigation or he would have known the corn had been equally divided. [See Hagener v. Pulitzer Pub. Co., 172 Mo. App. 436.] And certainly Bollomy had no corresponding interest in the matter.

We are of the opinion that under the facts in this case there was no qualified privilege, and so finding defendant's complaint that there was no proof of malice, nor of facts from which it could have been inferred, is without merit.

Defendant complains of admission of evidence of the condition of defendant as to the ownership of property. Such evidence in a libel or slander suit is clearly admissible. [Williamson v. Eckhoff, 185 Mo. App. 234, 170 S. W. 322; Sotham v. Drovers Telegram Co., 239

Mo. 606, 144 S. W. 428; Trimble v. Foster, 87 Mo. 49; Polston v. See, 54 Mo. 291; Buckley v. Knapp, 48 Mo. 152; Hickman v. Nelson, 211 S. W. 131; Taylor v. Pullen, 152 Mo. 434.] The fact that the title to the real estate is in defendant and his wife as tenants by the entirety would be no reason for excluding the evidence. The defendant certainly has an interest in such property, and the question is not whether his property is subject to a judgment lien, but as to his condition in life.

It follows from what we have heretofore said that defendant's complaint that plaintiff's instructions ignored the subject of qualified privilege is without merit.

Complaint is made that plaintiff's Instruction No 5 did not contain the condition that Charles Bollomy, the party to whom the defamatory words were published, apprehended or understood the words. It is true that such required finding was not in that particular instruction, but it was in other of plaintiff's instructions, and of course the instructions are to be read and considered together as a whole. In the case of Klaber v. C. R. I. & P. Ry. Co., 225 Mo. App. 940, 33 S. W. (2d) 149, on which defendant relies, not only did the criticized instruction fail to require a finding that the words were understood by others to whom they were published but the appellate court expressly stated that "none other given on the part of plaintiff requires a finding with respect of this matter, but all authorize a verdict as though it were enough for defendant to speak the defamatory words of and concerning plaintiff, whether heard and understood by others or not."

Defendant claims the instructions are conflicting inasmuch as plaintiff's Instruction No. 2 is based on an implication of malice and tells the jury it is not necessary that plaintiff prove express malice, whereas defendant's instructions No. 3 and No. 5 require the jury to find express malice. We think defendant's instructions went too far and place a burden on plaintiff's right of recovery that the law did not require. However, plaintiff's instruction was proper and contained the hypothetical facts authorizing a finding in his favor, and defendant's instructions were more favorable to defendant than he was entitled to. The cases cited by defendant do not support his contention. In the case of State ex rel. v. Ellison, 272 Mo. 571, plaintiff's instruction authorized a verdict for plaintiff without any finding for plaintiff upon a vital question, and therefore was in conflict with a defendant's instruction requiring a finding for plaintiff upon this vital question before they could return a verdict for plaintiff, and so the instructions were said to be in conflict. The same situation prevailed in the case of State ex rel. v. Trimble, 318 Mo. 173, 180, 300 S. W. 812, and in the case of Jno. O'Brien Boiler Works Co. v. Sievert, 256 S. W. 555. But such is not this case, wherein plaintiff's instructions embodied all essential questions warranting a verdict for plain-

1074

tiff. Defendant would have no right to complain at an invited error in his own instruction which was too favorable to him.

Defendant's final complaint is that the verdict was excessive, but no authority is cited in support of this complaint. The verdict was for $100 actual damages and $300 punitive damages. The mere statement of the modest amount of the verdict is convincing that the jury were not actuated by passion or prejudice. The rule as announced in the case of Brown v. Knapp & Co., 213 Mo. 655, l. c. 697, is as follows:

"The question of damages for a tort especially in a case of libel or slander is peculiarly within the province of the jury, and unless the damages are so unconscionable as to impress the court with its injustice and thereby to induce the court to believe that the jury were actuated by prejudice, partiality or corruption it rarely interferes with the verdict."

Finding no error prejudicial to the defendant (appellant) the judgment of the circuit court should be affirmed. It is so ordered. *McCullen* and *Anderson, JJ.,* concur.