Steve DVORAK, Plaintiff/Respondent,

v.

James O'FLYNN, et al.,
Defendants/Appellants.

No. 58366.

Missouri Court of Appeals,
Eastern District,
Division Three.

March 26, 1991.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 7, 1991.

Application to Transfer Denied
June 11, 1991.

Edward James Hanlon, City Counselor, St. Louis, Michael A. Shuman, County Counselor, Clayton, for defendants/appellants.

James Curtis Owen, Chesterfield, for plaintiff/respondent.

REINHARD, Presiding Judge.

Plaintiff filed an action for slander against defendants Ron Grames, Larry Brockelsby, and the members of the Boards of Police Commissioners of the City and County of St. Louis. The jury returned a verdict assessing separate $50,000 actual damage awards against defendants Grames and Brockelsby, for which the members of the Police Boards were held jointly liable, and separate $75,000 punitive damage awards against defendants Grames and Brockelsby alone. Defendants ·appeal; we reverse.

Defendants Grames and Brockelsby were employed by the Greater St. Louis Police Academy. Although the record contains little information concerning the organization of the Police Academy, it is clear that the Police Academy was operated under a contract between the Boards of Police Commissioners of the City and County of St. Louis. The Police Academy provided police training primarily to students sent by police departments in St. Louis City and County. Although the Police Academy received the majority of its applicants from these sources, it also accepted "independent" applicants unaffiliated with a police department. The independents, who paid $2,500 tuition, were required to obtain "sponsorship" from a police department. The sponsor had to complete a background check and sign a form stating that it "found the candidate to have character comparable to that of a person we would consider hiring as a police officer." A Police Academy handout for independent applicants stated that "[T]his endorsement will neither guarantee employment by their agency nor will it make them responsible for you at any time while in the basic recruit program if you are accepted." Within the Police Academy, Sergeant Morrow was in charge of the independent applicants. Brockelsby was director of the Police Academy, and Grames was an "instructional technologist" responsible for administering and grading the Police Academy admissions test.

The plaintiff had always wanted to be a police officer. His uncle had been an officer, and plaintiff had social relationships with officers from the St. Louis Police Department Armory and the Police Academy. He was a friend and business associate of Tony Daniele, a police officer involved in the administration of the Police Pension Fund. Officer Daniele told plaintiff that he must complete training at the Police Academy as a prerequisite to employment by a St. Louis County municipality. Officer Daniele's brother, Chief Angelo Daniele of the Hanley Hills police department, agreed to sponsor plaintiff's entry into the Police Academy. Chief Daniele sponsored plaintiff with the understanding that he had no commitment to hire plaintiff, although he did tell plaintiff that he would try to secure plaintiff a part-time job with his department if plaintiff was not hired while in the Police Academy.

Applicants to the Police Academy were required to pass several written examina-

tions and a test measuring physical ability. The first written test was a multiple choice examination measuring reading ability and consisting of three separately timed parts: a first section of twenty questions measuring reading ability; a second section of sixty questions measuring vocabulary; and a third section of thirty questions measuring reading comprehension. Applicants received a booklet containing all three sections at the beginning of the test, and received a separate answer sheet for recording the answers to the questions. The applicants retained the booklet and answer sheet throughout the reading test, but were instructed that they could not return to a previous section after the time for that section had expired.

Plaintiff and two other applicants arrived at the Police Academy for the tests on March 11, 1986. They were escorted to the testing area by Grames, the test proctor. After receiving instructions, plaintiff completed the written tests and the test measuring his physical ability. Plaintiff was accused of cheating on the written test after he had completed the physical ability test.

Plaintiff testified at trial that the applicants were directed by Grames to a large room, where they sat at a long table. Grames seated himself about three and one-half feet away in a position directly across the table from plaintiff. Grames reviewed the written instructions for the reading test with the applicants. One instruction indicated that the applicants could not return to a section of the test after the time for that section had expired. Grames instructed the applicants to ignore the written instruction directing them to avoid wild guessing. He told the applicants that he would give a two-minute warning at the end of the first section.

When instructed to do so, plaintiff began the first section of the test and marked his answers with a pencil on the answer sheet. Plaintiff testified that Grames was reading a novel while administering the test. Grames did not leave the room while administering the first section of the test, but plaintiff said Grames left the room "at least twice, probably three times" during the administration of the remaining sections.

Plaintiff said that he was "more than halfway done with the questions" in the first section when Grames looked at his watch and said, "I'm sorry, I wasn't looking at my watch. You have only got a minute and-a-half to complete the rest of the test." Plaintiff read one more question, which he recalled to be either question number 14 or 15, marked an answer for that question on the answer sheet, and then quickly marked answers for the remaining questions so that he would not run out of time. Plaintiff was certain he answered all the questions in the first section, because upon marking the answers he "sat there with [his] pencil looking at them" for twenty or thirty seconds before time expired. Plaintiff completed twenty-two of sixty questions in the second section and all twenty questions in the third. Grames then administered written grammar and spelling tests to the applicants and released them for the physical portion of the qualification procedure.

After the physical qualification, Sergeant Morrow called each applicant into his office. After meeting with the other applicants, Sergeant Morrow told plaintiff he passed the physical examination, but had cheated on the reading test, and related Grames' version of the incident. Plaintiff denied cheating and asked to speak to Grames, but was told Grames refused. Sergeant Morrow suggested plaintiff meet with director Brockelsby and asked plaintiff to leave.

Plaintiff met with Grames and Brockelsby several days later, and was told that he must file an appeal with the Police Boards. He later received a letter from Brockelsby informing him that he would not be considered as a candidate in the Police Academy, and stating:

Originally you were advised of our appeal process, but now it has been determined that this advice was incorrect. Inasmuch as you were only an applicant in our screening process, you are not entitled to appeal this decision. The appeal

process defined in our rules and regulations is designed to serve only those trainees actually accepted into the Pre–Service Program.

Plaintiff also testified that Officer Tony Daniele—friend, business associate, and brother of plaintiff's sponsor—was under investigation in early 1986 concerning illegal Police Pension Fund activity. Two months after the testing incident, investigators from a federal grand jury, the IRS, and FBI questioned plaintiff about Tony Daniele. Plaintiff testified an FBI agent stated he knew Brockelsby. The IRS also investigated plaintiff, but only found that plaintiff deserved a tax refund.

Plaintiff claimed he did not have time to cheat, and further claimed that he would not cheat because it was wrong and because the rules allowed him to take the test two more times if he failed.[1] He also claimed that a cheater would not leave so many questions in the second section unanswered. Plaintiff had no explanation why question number 18 was unanswered.

Applicant Donald Forrest, a police officer at the time of trial, testified that he remembered Grames leaving the room twice and reading a novel. He testified that he did not see plaintiff cheat. The other applicant, a St. Louis City police officer at the time of trial, testified that he said to plaintiff, "I don't see how you could have been cheating in that room."

Grames testified that plaintiff was working on question seven or eight when Grames warned the applicants that time had nearly expired. He claimed plaintiff had answered question number 13 when he announced the expiration of time. He said plaintiff then marked an answer for question number 14, but Grames did not object because he believed plaintiff's act was within acceptable procedure. While the applicants completed their physical qualification, Grames ran the tests through a machine which marked answers differing from those on a master answer sheet. While manually checking plaintiff's answers against the master answer sheet,

Grames said he noticed that plaintiff's answer sheet contained answers for questions number 15, 16, and 17. Grames said, "At that point, I realized that there was—there was an irregularity because I clearly saw they were not marked before." He concluded plaintiff violated the instructions, immediately informed Sergeant Morrow of his observations and told Morrow plaintiff had cheated. Sergeant Morrow had Grames finish grading the test and submit a memo[2] on the matter. Grames complied, and sent a copy to defendant Brockelsby in addition to discussing the incident with Brockelsby in person.

After relating his version at trial, Grames also testified that he was watching plaintiff because he noticed plaintiff "moving his lips and scanning the page with his hands," and interpreted plaintiff's actions as a sign of reading problems. Grames admitted that he said plaintiff looked "guilty" in the memo to his superiors, and explained that this meant plaintiff avoided eye contact with him.

Upon further questioning, Grames insisted that he was certain that the last six questions were unanswered when time expired, and had "no doubt" that the six were answered when he graded the exam. Grames first became aware that question number 18 was unanswered at trial. When asked if his memory was affected by the knowledge that question number 18 was unanswered, he replied, "It doesn't affect my memory at all. I am absolutely certain those answers were not marked at the time the time (sic) for that test was called." Plaintiff's counsel noted Grames' earlier testimony where Grames claimed he realized plaintiff cheated after Grames had graded answers 15, 16, and 17, and questioned whether Grames graded 18, 19, and 20. Grames replied, "Again, it's conjectural as far as where I went from there. Something indicated to me he had answered Questions 16 through 20 where he had not before." Grames admitted he stated in his memo that questions 15 through 20

---

1. Grames testified plaintiff failed the reading test.

2. Although the memo was admitted at trial, it was not made a part of the record on appeal.

were completed, and admitted he told plaintiff during this meeting after the test that Grames had answers for questions 15 through 20.

When asked if he recalled giving the applicants a two-minute warning on all three parts of the test, Grames replied, "I believe I did, yes," and claimed plaintiff's version was incorrect. Grames admitted that he had "no absolute memory of it" and stated his memory was based upon his memo. Plaintiff's attorney then had Grames read the text of his deposition taken in March of 1988. When asked at the deposition if he recalled giving a two-minute warning, Grames had answered, "Not specifically." Grames admitted that failure to give a two-minute warning was "wrong procedure" and admitted he had failed to give a two-minute warning in the past because his attention was focused on reading materials. Grames then admitted he stated in his memo both that he always gives a two-minute warning, and that he did so during the first section of the test.

Grames did not deny that he left the room during the second section of the test, and admitted that leaving the room was not "ordinary and customary." Grames admitted to stating, "I left the room on only one occasion" in the memo. Plaintiff's attorney asked "Do you in any way doubt the testimony of Mr. Forrest, Mr. Dvorak, and your own statement ... that you were out of the room more than once?" and Grames replied, "There is some doubt in my mind, yes, sir."

Brockelsby admitted at trial that he told plaintiff he had to rely upon Grames because he had "known him for a long time" and admitted his decision to rely upon Grames was based upon Grames' "track record." Brockelsby did not question the other candidates, did not review the test himself, and refused to speak to plaintiff's psychiatrist about the incident. One week after the incident, Brockelsby called Chief Daniele and explained the "circumstances and the reasons" why plaintiff was rejected from the Police Academy.

Grames and Brockelsby both testified that they did not recall seeing plaintiff in the Academy, although plaintiff claimed he had visited the Police Academy shooting range for six years, and had several Police Academy employees as friends.

Chief Daniele testified that Brockelsby telephoned him at the police department, related Grames' observations, and said plaintiff cheated. Brockelsby told him plaintiff was "kicked out" of the Police Academy. Chief Daniele indicated that he also spoke to either Tony Daniele or the plaintiff on the day after the incident. The jury found for the plaintiff against all defendants in the amounts noted above. This appeal followed.

■ We first address defendants' claim that Grames' communication to his superiors was not a "publication" within the meaning of that term. Publication is an element of a slander cause of action, *Jones v. Pinkerton's, Inc.*, 700 S.W.2d 456, 458 (Mo.App.1985), so if plaintiff did not prove Grames published his statements, then plaintiff's cause of action based upon Grames' statements must fail. A publication is the communication of defamatory matter to a third person. *Lonergan v. Love*, 235 Mo.App. 1066, 150 S.W.2d 534, 537 (1941). Defendants direct us to *Hellesen v. Knaus Truck Lines, Inc.*, 370 S.W.2d 341, 344 (Mo.1963), in which the Missouri Supreme Court held that "communications between officers of the same corporation in the due and regular course of the corporate business, or between different offices of the same corporation, are not publications to third persons." The rationale behind this holding is that such an act is only the corporation "communicating with itself." *Id.* Defendants claim Grames' statements were made and received within the scope of Grames' and his superiors' respective duties, and ask us to extend the rule set forth in *Hellesen* to Grames' statements. Defendants admit the Police Academy is not a corporation and the only evidence of its organization is that it is operated by the two Police Boards.

The circumstances here are more similar to those in *Ramacciotti v. Zinn*, 550 S.W.2d 217 (Mo.App.1977), where the publication involved a communication between

the chief of police and city manager of Webster Groves. In rejecting a *Hellesen* argument, the court partially relied upon a lack of evidence concerning the relationship between the chief and city manager. More recently, our court rejected a *Hellesen* claim in the case of *Washington v. Thomas*, 778 S.W.2d 792 (Mo.App.1989), where an allegedly slanderous statement was made in the context of a partnership relationship. Here, because it is admitted that the Police Academy was not a corporation, and there is no showing that an exception to the *Hellesen* rule applies, defendants' point is without merit.

■■■ Defendants next contend plaintiff failed to provide clear and convincing evidence that Grames made his statements with malice. We review the evidence in the light most favorable to the verdict. *Carter v. Willert Home Products, Inc.*, 714 S.W.2d 506, 507 (Mo. banc 1986). Because, as plaintiff does not dispute, Grames' statements were clearly made by a person with an interest or duty to persons having a corresponding duty, Grames enjoyed a qualified privilege that could only be overcome by clear and convincing evidence that Grames made his statements with malice. *See McDowell v. Credit Bureaus of Southeast Missouri, Inc.*, 747 S.W.2d 630, 632 (Mo. banc 1988); *Snodgrass v. Headco Industries, Inc.*, 640 S.W.2d 147, 153 (Mo. App.1982). Thus, plaintiff's case against Grames was submitted to the jury under instructions which required a finding that Grames made the statements either with the knowledge that they were false, or with reckless disregard for whether they were true or false at a time when he had serious doubts as to whether they were true. MAI 23.10(2). Proof of falsity alone is not proof of malice nor is malice shown by the defamatory nature of the charges. *Washington v. Thomas*, 778 S.W.2d 792, 799 (Mo. App.1989). Furthermore, mere negligent publication by defendant is insufficient. *Ramacciotti v. Zinn*, 550 S.W.2d 217, 226 (Mo.App.1977).

Plaintiff, in his brief, relies heavily upon three categories of fact to support a finding of malice. First, he contends that the jury could infer "contempt" on the part of Grames "because Grames could have easily concluded that plaintiff had connections (or 'steam' in police parlance) which would ensure his passage through the Academy." This inference of "contempt" is derived from the fact that plaintiff had several friends at the Police Academy. Second, plaintiff suggests that the defendants wanted to keep him out of the Police Academy because of his long-standing friendship with Tony Daniele who "was a person in the center of controversy." Third, plaintiff points to the inconsistencies in Grames' testimony, when compared to earlier statements in his memo and deposition, to support the assertion that Grames lied about plaintiff: "The contents of Defendant Grames' internal memorandum could have easily allowed the jury to find that he recklessly or intentionally lied concerning plaintiff's conduct because Grames lied three times again in his re-enaction of the event in question when he stated in his memorandum that: (1) he always gives a two minute warning; (2) he only left the room on one occasion; and (3) question number 18 was answered."

Clearly, plaintiff's assertion that Grames deliberately, falsely accused him of cheating rests upon speculative inferences derived from the evidence of plaintiff's "connections" with Officer Tony Daniele and officers from the Police Academy. Once this "evidence" is discarded and the other evidence relied upon by plaintiff is examined we can only conclude that the malice instruction was not supported by *clear and convincing* evidence.[3] This finding requires we reverse the actual damage award against Grames. Since the punitive damage claim also requires a finding of malice, that award must also be reversed.

■■■ We next review defendant Brockelsby's claim that he was entitled to a qualified privilege and that there was insuffi-

---

3. In addition to the evidence discussed by plaintiff in his brief we have examined all other evidence that might support the judgment.

cient evidence that he acted with malice. The trial court did not submit a verdict directing instruction requiring a finding of malice, but instead submitted an instruction based upon MAI 23.10(1), which required the jury to find Brockelsby "at fault in making such statement." Defendants claim Brockelsby's statements were qualifiedly privileged and thus the instruction should have required a finding that Brockelsby acted with malice.

Whether a defendant enjoys a qualified privilege is a question of law for the court. *Carter v. Willert Home Products, Inc.*, 714 S.W.2d 506, 513 (Mo. banc 1986). A communication is qualifiedly privileged if made between persons having an interest in or duty concerning the subject matter. *McDowell v. Credit Bureaus of Southeast Missouri, Inc.*, 747 S.W.2d 630, 632 (Mo. banc 1988). This interest or duty includes those of a personal, private, moral, and social nature. *Henry v. Halliburton*, 690 S.W.2d 775, 781 (Mo. banc 1985). As stated in *Lee v. W.E. Fuetterer Battery and Supplies Co.*, 323 Mo. 1204, 23 S.W.2d 45, 60 (Mo.1929):

> The occasion of making a defamatory communication is thus privileged—when it is made by one having an interest in making, *or a duty to make,* that particular defamatory communication (the interest or duty is in respect of the subject matter of the communication, as distinct from the mere form or expression of language) to one having a corresponding interest or duty in respect of that subject matter—that is to say, who has an interest in hearing, or a duty to arise upon hearing, such defamatory communication ... (Emphasis added).

Brockelsby testified that he believed he had an obligation to call Chief Daniele and that he routinely called sponsors to inform them of problems in the application process. Even though Chief Daniele had no commitment to employ plaintiff, we believe that the interests involved fall within those enumerated in *Lee.* Brockelsby's statement to Chief Daniele was qualifiedly privileged and the trial court erred as a matter of law

in failing to instruct on malice in plaintiff's actual damage claim.

Because the punitive damage instruction did require plaintiff to prove malice we see no need to remand for a new trial on this issue. As plaintiff had the opportunity to present all evidence available to him that would support a finding of malice for either actual or punitive damages we are able to consider whether he made a submissible case on both even though no instruction on malice was given with respect to actual damages. *See Carter v. Willert Home Products, Inc.*, 714 S.W.2d 506 (Mo. banc 1986).

In light of our determination, we now review the evidence as it pertains to the issue of Brockelsby's malice. The record reveals no evidence allowing a reasonable inference that Brockelsby made his statement to Chief Daniele with knowledge that it was false. Furthermore, we cannot say the plaintiff adduced substantial evidence sufficient to allow a jury to find *clearly and convincingly* that Brockelsby made his statements with reckless disregard for whether it was true or false at a time when he had serious doubts as to whether his statements were true or false. Brockelsby admitted at trial that he told plaintiff he had to rely upon Grames because he had "known him for a long time" and admitted his decision to rely upon Grames was based upon Grames' "track record." Brockelsby did not question the other candidates, did not review the test himself, and refused to speak to plaintiff's psychiatrist about the incident. Our court has stated that a failure to investigate does not of itself indicate a reckless disregard of the truth of a statement. *Williams v. Pulitzer Broadcasting Co.*, 706 S.W.2d 508, 512 (Mo.App.1986).

Plaintiff also argues that the jury could conclude that Brockelsby was motivated by knowledge of plaintiff's associations with Officer Tony Daniele and employees of the Police Academy. As with Grames, such a conclusion would be speculative. Thus we believe plaintiff failed to produce *clear and convincing* evidence that Brockelsby acted with reckless disregard for whether it was

true or false at a time when Brockelsby had serious doubts as to whether it was true. The lack of *clear and convincing* evidence requires reversal.

Since the judgments against the members of the Police Boards were based upon the statements of their employees, our reversal of the judgments against Grames and Brockelsby requires that we also reverse the judgments against the members of the Police Boards.

Judgments reversed.

CRANDALL, C.J., and CRANE, J., concur.